UNITED STATES, Appellee

v.

JOHN ROY BOURCHIER, Lieutenant, U. S. Navy, Appellant

5 USCMA 15, 17 CMR 15

No. 3774

Decided October 8, 1954

Lykes M. Boykin, ESQ, Frank J. DeFrancis, ESQ, and CDR John T. Davies, USN, for Appellant.

CDR Richard J. Selman, USN, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

During the early morning of June 24, 1952—shortly after 2:00 a.m.—authorities at the Corpus Christi Naval Air Station received a report that Ensign Alice W., a Navy nurse, had been raped by an officer of that service. Later that day Ensign W. identified the accused, Lieutenant John Roy Bourchier, as having been her assailant. A pretrial investigation, pursuant to Article 32, Uniform Code of Military Justice, 50 USC § 603, was conducted almost at once, and the charge of rape was referred for trial. Through the civilian defense counsel who had represented him at the investigation, the accused requested various permissible delays prior to trial. As a result the court-martial hearing did not begin until August 4, 1952. The accused was defended by civilian counsel as well as by two Navy law specialists.

Ensign W. testified that on June 23, 1952, at about 10:30 p.m.—having completed her day's tour at the station hospital—she was awaiting a bus for transportation to Corpus Christi from the

Naval base. Her destination was the apartment in town in which she resided with her husband, a civilian. The accused drew up in an automobile and volunteered to drive her to town—which offer she accepted. En route to Corpus Christi, Bourchier made certain minor stops, and thereafter—under a pretext—directed his car toward a nearby golf course. Once there, he came to a stop and began amorous overtures—which Mrs. W. rebuffed. Thereupon he struck her repeatedly. According to the witness, she was by that time terrified—both for her own safety and for that of an unborn child with which she was heavy. Consequently, she ceased further resistance and submitted to three acts of penetration by the accused. At approximately 2:00 a.m. she was returned to her home by the accused. She promptly awakened her husband to inform him that she had just suffered "2-½ hours of hell" at the hands of a Naval officer. The husband immediately called a Navy physician. Medical examination corroborated Mrs. W.'s story of recent sexual intercourse, and disclosed that she bore severe bruises, especially in the region of the face. However, her clothing was almost completely unharmed.

In opposition, the defense presented evidence of alibi to establish that Lieutenant Bourchier could not have been engaged in raping Mrs. W. on the golf course at the time she mentioned. However, the accused himself was unable to bolster this alibi—for he testified at the trial that he had drunk heavily during the evening of June 23, and had "blacked out" during the entire period covering the events in question. He could not, he said, remember Mrs. W. in any way. He also recited—and sought to corroborate through the testimony of his wife—the occurrence of similar blackouts in the past. A psychiatrist, a Doctor Gardiner, offered testimony tending in some degree to substantiate the claim of alcoholic amnesia. Through cross-examination and argument, the defense also sought to suggest that, if Mrs. W. had experienced sexual intercourse on the night of June 23, it was in no wise without her consent. Further, strong character evidence was introduced to support the innocence of the accused.

The court-martial, however, accepted the account of the prosecuting witness—which was unshaken by the most rigorous defense examination—and found the accused guilty of rape, in violation of the Uniform Code of Military Justice, Article 120, 50 USC § 714. He was sentenced to dismissal, to total forfeitures, and to ten years' confinement at hard labor. This sentence was mitigated in part by reviewing authorities—presumably in response to strong recommendations of clemency from members of the court-martial. Moreover, execution of the sentence as to forfeitures was deferred until the completion of appellate review, and the accused was permitted to remain in a status of restriction—as distinguished from one of confinement—for a like period. However, the finding of guilt remained intact—and this Court has denied the petition of the accused for review of errors alleged to have taken place at his trial.

The accused has, in addition, offered a petition seeking a new trial, which presents unique problems. As appears from this petition and the oral argument thereon, the accused—as a part of his effort to secure review by this Court—employed a Washington law firm to represent him. Pursuant to the request of his counsel, he was transferred to a Naval installation near Washington, in order that he might be available for consultation with them. Subsequent to his arrival, arrangements were made for his examination by Doctor John D. Schultz, a professionally competent and reputable psychiatrist connected with the Georgetown University Hospital in that city. Dr. Schultz accomplished a sodium pentothal interview with the accused. Under the influence of this so-called "truth serum," and prompted by proper questions from the psychiatrist, Lieutenant Bourchier related that he had indeed driven Mrs. W. in his automobile on the night of June 23, 1952, and that he had made certain stops, as indicated by her. However, thereafter he stated that he had also gone with the nurse to an establishment called Zackie's Drive-In

Restaurant in Corpus Christi—a matter unmentioned in Mrs. W.'s testimony. Without reciting the topography involved, it may be said that this restaurant was located far from the route followed that night—as described in Mrs. W.'s testimony. The accused—under sodium pentothal—also described the waitress who had served them at this cafe.

According to the transcript of the accused's sodium pentothal interview, Mrs. W. fondled him suggestively while they were at Zackie's. Having no sort of wish to reject her advances, Lieutenant Bourchier thereupon drove to the golf course. There, with the complete consent and cooperation of Mrs. W., he participated in three separate acts of sexual intercourse. As the accused reported the facts, Mrs. W.'s frenzy and fervor became so intense that it was necessary to strike her several times to calm her. Finally the accused drove Mrs. W. to her home at approximately 12:30 a.m. on June 24, 1952. To put it succinctly, Lieutenant Bourchier's sodium pentothal statement is to the general effect that she—rather than himself—constituted the villain of the piece.

The affidavit of Dr. Schultz recites that the facts elicited from the accused's subconscious during the sodium pentothal interview "can, with proper medical treatment, be brought to his conscious mind and recollection, and that he could then testify to such facts from his own personal knowledge." Another defense affidavit was that of one Shirley John, who identified herself as the waitress who had served the accused and Mrs. W. at Zackie's on the evening of June 23, 1952. Her affidavit of October 14, 1953, recited in lush detail a conversation held at that time with two persons, whom—through the use of photographs—she identified as the accused and Mrs. W. Other defense affidavits indirectly and circumstantially attacked Mrs. W.'s character with respect to chastity.

## II

The Uniform Code of Military Justice, Article 73, 50 USC § 660, and the Manual for Courts-Martial, United States, 1951, paragraph 109, outline the criteria for securing a new trial. Insofar as the basis of newly-discovered evidence is concerned, it is required that the evidence have been discovered subsequent to trial; that "due diligence" was employed by the petitioner to discover it at the time of trial; and the evidence "would probably produce a substantially more favorable result for the accused."

The most significant item of "new" evidence offered here is the statement of the accused made under █ the influence of sodium pentothal. Since, of course, the accused was present during the trial, it might well be urged that his own testimony could hardly be "newly-discovered." However, such an analysis is much too crude—for the existence of genuine amnesia in some persons as to some events has long been recognized by the medical profession, as well as by this Court. See United States v. Olvera, 4 USCMA 134, 15 CMR 134. Thus, if the accused was characterized by a genuine amnesia at the time of trial with respect to events transpiring during the night of June 23, 1952, then his testimony was truly unavailable on the former occasion. And if there were to be a true recovery of recollection thereafter, we are convinced that "new" evidence would have been discovered.

Of course, this assumption involves the risk of spurious claims of amnesia in the first instance, and of recovery of recollection in the second. It is always possible that an accused may be motivated—either consciously or unconsciously—to claim amnesia at his trial if he believes that, in the event of conviction, he can thereafter "recover" his recollection, and secure a second trial and a further chance of acquittal. Or, if an accused genuinely suffers from amnesia during a certain period, within which he is alleged to have committed an offense for which he is convicted, he will, of course, possess every prompting—both conscious and subconscious—to "reconstruct" the forgotten events in a manner favorable to himself. Thereafter he can claim a "recovered" recollection, and demand a retrial.

20

In light of the emphatically dangerous possibilities of damage to law administration implicit in a ▮▮▮▮ holding that an accused's recovery of memory produces "newly-discovered" evidence, we must apply with special caution the requirement of "due diligence" in unearthing this "new" evidence—that is, the petitioner's recovered memory. In the instant case that memory is alleged to have been revived temporarily by means of sodium pentothal injections, and may conceivably be caused to return permanently through psychiatric treatment. At present—so far as we are shown, however—recollection of the disputed events exists only in the subject's subconscious, although Dr. Schultz has asserted that, in his opinion, Lieutenant Bourchier could, "with proper medical treatment," recover a conscious recollection.

With regard to the recovery of recollection, it is distinctly relevant to inquire why the use of sodium pentothal treatment was not resorted to at an earlier stage—that is, before the accused's trial. The record shows that a qualified psychiatrist—the Doctor Gardiner mentioned earlier—had examined the accused prior to his trial by court-martial. While it is not clearly reflected in the record, we shall assume that sodium pentothal—or some other "truth serum"—was not administered during this psychiatric examination. Yet defense counsel—whom the record reveals to have been able and resourceful—appear to have made no request for a more extensive examination of the accused. It is true that they did move on several occasions for continuances to enable them to prepare further for trial —but these motions were predicated chiefly on the absence of witnesses. Indeed, nothing has been brought to our attention which intimates even remotely that defense counsel wished a continuance in order that they might obtain further psychiatric data relating to the accused, or to seek the recovery of his errant recollection.

That the defense made a conscious choice not to avail itself of sodium pentothal, or the like, in exploring the accused's mind is revealed beyond peradventure by a passage in the record of trial. Dr. Gardiner, the psychiatrist, had been presented as a defense witness to testify to the effect that alcoholic amnesia is a phenomenon generally recognized by medical science. Trial counsel inquired of him concerning methods for determining the validity of a claim of alcoholic amnesia. At this point the following transpired:

"Q. [by trial counsel]: Would the use of sodium amytal [another "truth drug" similar to sodium pentothal] aid in determining whether or not a claim of alcoholic amnesia was genuine?

"DC: May I interrupt to interpose an objection. Now, the field of medicine is out of the particular direction of the issue involved in this case, and out of the field of evidence. On the point of sodium amytal, it is a matter of very divided opinion, and it happens to be a matter wherein medical science holds that it can be used for certain purposes effectively; however, the use of it has not extended to medical law, and a number of courts have often passed on it as an improper question."

The law officer overruled the objection, whereupon the psychiatrist indicated that such a test might be of value in the connection inquired of by trial counsel. He also asserted that—while a difference of views might exist thereon—it was his opinion that a true alcoholic amnesia could *not* be uncovered by sodium amytal.[1]

---

[1] In light of Dr. Gardiner's testimony to the effect that in the case of alcoholic amnesia recollection *could not* be recovered via sodium amytal, and the affidavit from Dr. Schultz that he *did* refresh the accused's recollection of the allegedly amnesic incident of June 23, 1952, we might inquire into the type of "amnesia" the accused was said to be suffering from at the time of the trial. See United States v. Olvera, supra. Was he suffering from a psychosis? If so, it is hard to consider that this would not have been observed by Dr. Gardiner. And no psychosis is mentioned by Dr. Schultz. Did some form of hysteria cause a repression of the recollection of the evening with Mrs.

The significant thing is that defense counsel clearly exhibited at the trial their complete familiarity with sodium amytal—and its fellows—and their claimed potentialities. Indeed, far from suggesting that their client *should* be tested under that drug, or some kindred specific, they impugned the validity of results obtained with it. Observing these circumstances, we cannot in conscience say that the petitioner has exhibited due diligence with reference to securing "new" evidence—that consisting of his own statements made under sodium pentothal.

### III

The term, "truth serum," is something of a misnomer. While sodium pentothal, sodium amytal, ▆▆▆▆▆ and related drugs, may operate to lessen inhibitions and remove repressions—with the result that the person interviewed under their influence may be induced to speak with greater freedom—not always will his statements be true in the sense of conforming to actual fact. As two psychiatric writers have put it:

"We are in agreement with practically all other workers in this field that sodium amytal interviews should be used only with great caution in medico-legal work. . . . While it is popularly believed that a sodium amytal or sodium pentothal interview is a form of 'truth serum' and that the person subjected to it invariably reveals the truth about his actions and motives, this is not the case at all. Many persons, even under the influence of the drug, are able to withhold information. As a matter of fact, many are able to lie and fabricate, and this is especially true about psychopathic defendants. Further, under the influence of the drug, many individuals are so suggestible that they will agree to questions improperly phrased or formulated. They are often unable to differentiate between thoughts and actions." [See Narcodiagnosis and Narcotherapy, by Hoch and Polatin, in Bychowski and Despert, Specialized Techniques in Psychotherapy.]

Other writers say of sodium pentothal and the like:

". . . Referred to in the popular press as 'truth-serum,' the drug used is not a serum and, as will appear, people do not always tell the 'truth' under its influence.

• • • • • •

". . . But drugs are not 'truth sera.' They lessen inhibitions to verbalization and stimulate unrepressed expression not only of fact but fancy and suggestion as well. Thus the material produced is not 'truth' in the sense that it conforms to empirical fact." [Dession, Freedman, Donnelly, Redlich, Drug-Induced Revelation and Criminal Investigation, 62 Yale LJ 315, 317, 319.]

"In fact, the narcoexamination obtains too rarely valuable results to contemplate its use at present. And even if a superpentothal were perfected, it would be necessary to undertake systematic research in order to train experts capable to avoid or baffle the chances of suggestion or affabulation. It is doubtful that this may be contemplated in the near future." [Gagnieur, The Judicial Use of Psychonarcosis in France, 40 J Crim L 370, 380.]

As developed in numerous writings by medical authorities, the results of a drug-induced interview are chiefly of value as an ancillary technique in the exploration of personality.[2] According-

---

W.? If so, was such hysteria a result of guilt feelings because of having raped her, or instead of guilt because, in having voluntary intercourse with her, he had been unfaithful to his own wife? Or was the accused simply a malingerer feigning amnesia?

[2] The most recent pronouncement in this regard to be brought to our attention is reported in the Washington Post of May 4, 1954, as follows:
"ST. LOUIS, Mo., May 4 (UP).— 'Amateur detectives' among psychiatrists would do well to leave police work to policemen, the American Psychiatric Association was told today.
"Dr. John M. MacDonald of the University of Colorado told a clinical

ly, judicial opinion has been virtually unanimous in refusing to permit the introduction in evidence of the results of drug-induced or "truth serum" interviews. Cf. State v. Lindemuth, 56 NM 257, 243 P2d 325; Henderson v. State, — Okla Cr App —, 230 P2d 495; People v. McNichol, 100 Cal App2d 554, 224 P2d 21. Cf. People v. Ford, 304 NY 679, 107 NE2d 595; Orange v. Commonwealth, 191 Va 423, 61 SE2d 267; Wigmore, Evidence, 3d ed § 998.

With regard to the transcript of the sodium pentothal interview with this accused, we may observe that there are more than a few factors which serve to diminish its weight. First and most obvious, the accused naturally possessed a tremendous interest in the outcome, which—if, as seems generally to be accepted, prevarication is possible under sodium pentothal—would tend to produce untruth in this case. Secondly, the episode in question was a sexual one, and thus falls within an area supercharged with subconscious overtones. It is indeed a substantial understatement to observe that impulses in the direction of fantasy are especially strong in the sexual realm.[3]

In addition to the motivations, either conscious or unconscious, which might lead to distortions in the accused's statements, there is the circumstance of the substantial delay between the alleged offense and the moment of the interview with Doctor Schultz. During that period the accused was afforded ample opportunity for either conscious or subconscious reconstruction of the events of June 23, which, allegedly, he had been unable to remember at the trial. Such reconstruction—if it occurred—could scarcely have been other than affected by the accused's having heard the testimony of witnesses during a lengthy trial, and by noting the hypotheses of counsel advanced during their arguments. As to an individual even mildly suggestible, these events would have had undoubted impact. It is difficult, too, to evaluate the traumatic effect on the accused, of finding himself deemed guilty of a serious crime and of hearing himself sentenced to ten years' confinement and to dismissal. His trauma, if any, might well have been reflected in a distinctly distorted version of what had transpired in the company of the prosecutrix.

---

session at the APA's annual meeting that a person who is determined to lie can do so even under the influence of the so-called 'truth' drugs. And a person who is likely to confess a crime, he said, probably would do so without the use of drugs.

"MacDonald said a professional lawbreaker could leap on the 'honorable opportunity' to tell a psychiatrist something he had previously 'forgotten.' Such 'restoration of memory' under influence of narcotics can, MacDonald said, later form a basis for an insanity plea.

"MacDonald said the term 'truth serum' is misleading because the barbituates used are not serums and it has been proved that the ramblings of a drugged suspect may be far from truthful.

" 'The psychiatrist is not an amateur detective and should not participate in purely criminal investigations,' he said.

"But he recommended narcoanalysis—psychoanalysis through use of drugs—for examining defendants who have entered insanity pleas if the suspect has given his written consent, has talked with his lawyer and if nothing of what he tells the psychiatrist will be used as evidence against him."

[3] Actually the accused's "truth serum" interviews seem to fit within either of at least two fairly typical patterns of fantasy. One might be termed the "Don Juan" pattern. In accord with this, the subject harboring the fantasy conceives himself to be an object of special desirability to females, and believes that he is the subject of special attention from members of the opposite sex. This fantasy affords a wish-fulfillment for sexual cravings, and perhaps compensates for subconscious feelings of inadequacy and insecurity. A second pattern of fantasy is that of projection. The presence of overweening sexual desire and aggression is projected to another person. Such fantasies would tend in the accused's case to relieve guilt feelings, which might arise either from having raped Mrs. W., or from having entertained desires inconsistent with the marital fidelity insisted on by society.

Without mention of further details, it suffices to say that a statement under sodium amytal, or its cousin, sodium pentothal, *can be* untrue and based on fantasy. As to the present accused, there are particularly compelling reasons for believing that his statement was a fantasy. Clearly then, it would be no more nearly admissible than any other interview under these drugs, which interviews are almost universally held to be evidentially unacceptable.

Dr. Schultz states that a conscious memory of the events might be restored to the accused "with proper ▮▮▮▮ ▮ medical treatment." So far as we know, this has not been done. It would be little short of folly to grant a new trial in this case on the bare possibility that Lieutenant Bourchier might be able to testify—and thereafter to discover that he had been unable to regain his memory. At such a point—since the sodium pentothal interview itself could not be used—we would be in the position of having directed the rehearing of an extremely lengthy trial on evidence virtually identical with that which had been present at the original proceeding. United States v. Robinson [ACM 6585], 12 CMR 860. If, however, the accused did purport to have recovered his memory, and to testify from present recollection, what then would be the effect of this new evidence? Rather clearly his testimony would be subjected to a devastating cross-examination calculated to reveal the strong possibility that his version of the events of June 23, 1952, was simply the crystallization of fantasy.

Examining the weaknesses inherent in the method by which the accused's own testimony was made available, we have serious doubts that, in the event of retrial, the result would be "substantially more favorable to him." In any event, we are sure that the petitioner did not proceed with "due diligence" in fathoming his subconscious through sodium pentothal.

IV

The affidavit of Shirley John falls within the same category—that is, one of evidence which, with due ▮▮▮▮ ▮ diligence, the accused might have unearthed prior to his trial. Moreover, the elaborately detailed recollection on her part of a conversation occurring more than a year before—and at a place at which she must have conversed with innumerable other customers—defies credibility.

The affidavits tending to impugn Mrs. W.'s sexual virtue also involve matters which could have been ▮▮▮▮ ▮ properly investigated prior to the accused's trial and presented to the court-martial there. They are highly general in nature—and therefore, at the same time, difficult to refute and less credible. The lapse of time between the events recited in the affidavits and their execution suggests that these affiants, too, might have reconstructed the events stated in those documents.

In further connection with the degree of credence to be attached to the evidence submitted by the defense, we may observe that, on its surface, the accused's sodium pentothal statement seems self-contradictory and incredible. Particularly is this true with respect to the item of total lapsed time. Admittedly an individual under the influence of "truth serum" may be unable to achieve the same accuracy as to time as another describing the same events when free from the effects of drugs. Yet, according to the accused, he joined the nurse at the Naval Air Station at approximately 10:30 p.m. Thereafter he paused on the base to visit the quarters of another officer; halted at a further spot to secure refreshments; continued to Corpus Christi and Zackie's restaurant; there obtained a sandwich and a drink; chatted with Shirley John; stopped elsewhere to observe an airplane; drove to the golf course; engaged in three completed and—he says—much prolonged acts of intercourse; returned to town and reached the victim's home by 12:30 a.m. That all of this should have transpired within a period of two hours tends to stretch credibility. Indeed it strikes us that the accused would have been much pressed to accomplish these numerous and diversified

24

activities by 2:00 a.m.—the hour at which both Mrs. W. and her husband with definiteness placed her arrival at their apartment.

## V

In their petition for new trial and the arguments thereon, appellate defense counsel have occasionally ▮▮▮▮ ▮ referred to Mrs. W. as having committed a "fraud on the court." It is undeniable that "confessed or proved perjury in testimony" may constitute reason to grant a new trial. See Manual, supra, paragraph 109*d* (3). However, it is clear that there has been no "confession" to perjury by Mrs. W. Moreover, the numerous defects in the evidence adduced by the defense preclude a determination that perjury has been "proved." Gordon v. United States, 178 F2d 896 (CA6th Cir); United States v. Hiss, 107 F Supp 128 (SD NY), *aff'd,* 201 F2d 372 (CA2d Cir), *cert denied,* 345 US 942, 97 L ed 1368, 73 S Ct 830; United States v. Johnson, 142 F2d 588 (CA7th Cir), see also 327 US 106, 90 L ed 562, 66 S Ct 464.

Prior to trial the accused was aware of the evidence expected from Mrs. W. Her testimony conformed to those expectations, with the result that there was no element of surprise—certainly not such as might support a holding that there existed a "fraud on the court" demanding another trial. See Larrison v. United States, 24 F2d 82 (CA7th Cir). In any event, the basic policy applicable to petitions for new trial—as well as that found in the general area of res judicata—is that a party shall not lightly be permitted to relitigate issues once decided. United States v. Hiss, supra; Weiss v. United States, 122 F2d 675 (CA5th Cir), *cert denied,* 314 US 687, 86 L ed 550, 62 S Ct 300. The issue of Mrs. W.'s credibility has been decided adversely to the accused. This decision was reached despite repeated assaults on her veracity conducted by able and ingenious defense counsel. It is now requested that her truthfulness be reexamined on the basis of new evidence which, as has been demonstrated previously, the defense chose not to seek in preparation for the initial hearing. Although the defense may characterize the present problem as one of "fraud on the court," the fundamental policy of imposing a terminus to litigation prevents the grant of a new trial here. It is manifest that a different result would accord to an accused person *carte blanche* to seek an unlimited number of trials through the introduction of affidavits contradicting prosecution witnesses on whose testimony his conviction had rested.

## VI

Two additional phases of the problem before us merit brief discussion. In light of the "evidence" ▮▮▮▮ ▮ adduced during the sodium pentothal interview, which has been described, appellate defense counsel urged strenuously in their initial brief the possibility that Ensign W.'s injuries were the handiwork of her husband—a product of his anger at her early morning return to their home in the company of an unknown Naval officer. Because of the rather dogmatic tenor of certain statements contained in the affidavit of Dr. Schultz with respect to the truthfulness of the accused's account of the events with which we are concerned—and out of an abundance of caution—we were impelled to explore this possibility fully. Consequently, we referred the matter to a referee for further investigation pursuant to the provisions of Rule 52 of this Court's Rules of Practice and Procedure.

As a result of our order, a hearing was held for the purpose of ascertaining whether there was any sort of evidence tending to support the alternative suggested by defense counsel. At this hearing Commander James A. Addison, Medical Corps, United States Navy, was sworn and testified. For some two and a half months prior to the incident of June 23, Ensign W. had worked under the direction of Commander Addison in the psychiatric ward of the Corpus Christi Naval Hospital, of which the latter was in charge at the time. Dr. Addison had also testified at the original trial, and it was he whom the prosecutrix's husband had summoned to at-

tend his wife on the night of the alleged rape.

With respect to the establishment of the contention advanced by the defense, this avenue of inquiry proved wholly unprofitable. Although Dr. Addison was subjected to a most thorough examination—during which the referee properly relaxed the usual rules of evidence in order to accord counsel the widest possible interrogative latitude—there was simply nothing in his testimony which even remotely served to show that unpleasantness had developed between the prosecutrix and her husband on the night in question. Nor did anything appear on which to base the slenderest belief that the injuries of the prosecutrix resulted from physical chastisement by her husband. The witness testified that he could recall no disorder nor disarray in Ensign W.'s apartment tending to suggest an encounter between her husband and herself, and that he had observed nothing in the deportment of either indicating the existence of animosity. Moreover —since we had indicated a cautionary disposition to consider any shred of additional evidence uncovered by either party bearing on the limited issue framed for investigation—the prosecution filed with its special brief, submitted after completion of the referee's hearing, the affidavits of Ensign W.'s landlord and his wife, together with the individual affidavits of the two couples who occupied adjoining apartments in the same building.

Without exception, these affidavits are to the effect that none of the affiants had at any time had occasion to question the mutual trust and affection of Ensign W. and her husband; that they had never been known to quarrel; that Ensign W. was of the highest moral character; and that her conduct during her assignment in Corpus Christi had won for her the approbation and esteem of all. In addition, the affidavits all state that at no time—and especially during the night of June 23 and the morning of June 24—did the affiants hear sounds emanating from the W.'s apartment tending to show that a struggle was in progress. It appears that the landlord's house is situated no more

than 20 feet from that occupied by his tenants, and that the other lessees live in the same building, the walls of which were described as "paper thin" and without soundproofing of any nature. At the termination of this additional investigation, there had been produced not one iota of evidence to support the theory that the prosecutrix had suffered abuse at her husband's hands. On the contrary, the evidence overwhelmingly tends to negate such a possibility.

It would appear that defense counsel has attempted to use our order directing this additional investigation as a key for unlocking a veritable Pandora's box of judicial ills which appellate tribunals—and for sound reason—have long and jealousy striven to keep closed. On completion of the referee's hearing, defense counsel filed in this Court a paper styled "A Motion for Appropriate Relief," attached to which were affidavits from two persons purporting to show that command influence had been exercised for the purpose of insuring conviction of the accused. One of these affidavits was supplied by the officer who, at the time of the original hearing, was serving as Assistant Administrative Officer at the Corpus Christi Naval Air Station. He avers that throughout the period before and during the trial, his immediate superior, the Administrative Officer, was frequently visited by trial counsel, and that lengthy discussions of the case ensued during which trial counsel was held to declare unequivocally that "the Admiral [the convening authority] wants a conviction in this case." He also states that he had a number of discussions with one of the members of the court-martial, in the course of which the latter alluded in a general way to the exertion of command pressure in the case.

The second affidavit came from a Reserve Naval Officer now on inactive duty, who states that he had occasion to overhear two officers discussing the Bourchier case in the Corpus Christi Officers' Club sometime during late February or early March of 1953. According to this affidavit, one of the speakers —who was subsequently identified to

26

the affiant as a court-martial member—declared that members "were told just how we were supposed to vote in *that* case"; that he had first voted for acquittal, but had subsequently been informed by another member that the authorities wanted a conviction; and that—because of this and other pressure—he had been induced to change his vote.

Appellate Government counsel promptly filed counter affidavits designed to refute this eleventh hour defense contention. That of the Staff Legal Officer of the Naval Air Station at the time of the trial is to the effect that, not only are the statements attributed to the convening authority false and fictitious, but that he was specifically directed by the latter to insure that the rights of the accused and the prerogatives of his civilian counsel were fully safeguarded in conformity with the provisions of the Uniform Code. The Administrative Officer states positively that at no time did trial counsel so much as imply to him that the convening authority desired to obtain a conviction in the case, and that he did not attempt in any way to influence the members of the court or have the slightest knowledge of their opinions in the premises. The affidavit of trial counsel, too, flatly denies the statement attributed to him by the Assistant Administrative Officer, and further declares that the convening authority at no time intimated that he had an interest in the outcome of the litigation.

Even more forceful is the affidavit of the court-martial member specifically referred to in the affidavits filed by the defense. This officer denies that he was subjected to command pressure, or other improper influence of any nature, or that he had suggested to any person that he had been. To buttress his answers to the allegations contained in the second defense affidavit, he states that he was detached from the Naval Air Station in August 1952; was assigned to sea duty the following month; did not return to Corpus Christi until October 1953; and that it was therefore impossible for him to have been present in the Officers' Club during either February or March 1953. A certified extract from the log of the U.S.S. Tripoli, to which this officer was assigned following his departure from Corpus Christi, reveals that during the first six months of 1952 the vessel was operating in European waters and made several crossings between the United States and Italy. Although this source discloses that the Tripoli had been berthed at various Atlantic ports in this country from February 2 to March 6, 1953, defense counsel have produced no evidence whatever tending to show inaccuracy in the affiant's statement that he was not present in Corpus Christi at the time specified in the defense's second affidavit.

While the failure of the defense to attempt disproof of this assertion by the court-martial member is not without significance, it is quite immaterial so far as our disposition of the matter is concerned. It is perfectly clear that the motion and supplemental affidavits represent an impermissible attempt to impeach the findings of the court-martial. The fundamental rule that the testimony of jurors will not be received to impeach their verdict, with respect to matters which essentially inhere therein, is too well settled to require citation of authority. We are not unmindful of the fact that an exception to this principle permits the reception of such testimony when it relates to extraneous influences to which the jurors have been exposed. Mattox v. United States, 146 US 140, 36 L ed 917, 13 S Ct 50; Wheaton v. United States, 133 F2d 522 (CA8th Cir); Liggett & Meyers Tobacco Co. v. Imbraguglia, 73 F Supp 909 (Md); cf. Wharton v. People, 104 Colo 260, 90 P2d 615. However, this exception offers little solace to the defense. The affidavits tending to impeach the findings here did not come from a member of the court-martial; they are merely those of third parties professing to report the statements of a member made without the sanction of an oath. It is equally well settled that affidavits of this nature are inadmissible, and that the declarations of jurors, not under oath, made subsequent to the trial, in the presence of third parties, are not competent to impeach the verdict. Walton v. Wild Goose Mining and

Trading Co., 123 Fed 209 (CA 9th Cir), *cert denied* 194 US 631, 48 L ed 1158, 24 S Ct 856; United States v. McDonald, 293 Fed 433 (Minn); Taylor v. Garnett, 110 Ind 287, 11 NE 309; Maryland Casualty Co. v. Seattle Electric Co., 75 Wash 430, 134 Pac 1097; 53 Am Jur, Trial § 1118; 8 Wigmore, Evidence § 2354.

In view of. the widespread application of this latter principle—see Wigmore, supra—it is manifest that the affidavits of the defense even in the absence of rebuttal by the Government, could not suffice to impeach the present court-martial's findings, or to lay the foundation for the grant of a new trial. Moreover, the import of the Government's response tends strongly to indicate that defense counsel—faced with the necessity for making bricks without straw—have engaged in a feverish attempt to seek this latter commodity in an entirely understandable effort to save the accused from the effects of the court's judgment of guilt. The affidavits on which the motions for a new trial, and other appropriate relief, are based have proved most insubstantial and unsatisfactory. Purporting to pose grave issues in the administration of military law and tending at first glance to show a subversion of justice, in reality they do no more than cast diaphanous shadows on the proceedings which vanish wholly in the light of closer scrutiny. It is perhaps to be expected that—having been convicted, sentenced, and denied a writ of review—an accused will attempt to lay before this Court any item he believes may result in his freedom, regardless of how frivolous the matter may be.[4] This propensity on the part of an accused should excite in his counsel a commensurate vigilance to subject such matter to careful examination before embodying it in a formal pleading.

There must be an end to litigation. That the accused has had his day in court cannot be questioned. That day has now come to an end. With an eye, therefore, to all the pertinent evidence —and the requirement of due diligence in securing it—we cannot say that the petitioner is entitled to a new trial. Accordingly, his petition is denied.

LATIMER, Judge (concurring):

I concur.

On the 18th day of January 1954 we denied accused's petition for a grant of review and for a new trial. A petition for reconsideration of our ruling on the petition for new trial was filed but it merely reiterated, reasserted, and reargued matters decided by us adversely to the accused. Today's opinion is, in fact, an elaboration on some of the principles which prompted me to deny the petition for a new trial. For procedural reasons, I would prefer to found my conclusion for denial of the present petition for rehearing—not new trial— on the grounds that it is merely a repetition of previously asserted grounds for relief which were considered thoroughly and disposed of by our former ruling. However, in view of the fact that Judge Brosman answers adequately the issue presented by the original motion for new trial, and all subsequent matters flowing therefrom, I concur with him in his opinion and his disposition of the proceedings.

QUINN, Chief Judge (dissenting):

I dissent.

In my opinion the petition for a new trial should be granted. There are many aspects of this case which disturb me greatly. In the first place, the complaining witness had only to board the bus which had stopped to take her home and this problem would not be before us. Instead of availing herself of the

---

[4] Rather suggestive are the following remarks in the affidavit of Ensign W.'s former landlady:

"A few months ago, a man came to my house who introduced himself as an investigator, who was working on LT J. R. BOUCHIER'S [sic] case. He did his best to get me to say things that were not true and he kept trying to get me to say that Carl and Alice had not been getting along together and that on occasions she had been struck by Carl. The investigator intimated that he had some evidence to this effect but I told him that I did not believe it, as I had never heard Carl or Alice quarrel."

quick and safe method of transportation at her disposal, she elected to ride home with a man she didn't know. This was at 10:00 at night. During the ride the car stopped at two or three places where she had ample opportunity to leave, if she apprehended any danger, particularly in view of the fact that she had been informed that day that she was pregnant, and she had not yet told her husband.

Perhaps we should disregard the testimony of the accused, as resurrected by the sodium amytal, but ▮ I cannot concur with my associates in the conclusion that the testimony of Shirley John is completely incredible. The majority blithely and unceremoniously brushes aside the story that she waited on the accused and the complaining witness at a restaurant far beyond the beaten path to the latter's home. If they were actually at that restaurant, serious doubt is cast upon the entire testimony of Ensign W.

Maybe the accused was lax in his preparations for trial; and it is true that some delay and expense would be involved in a second trial, but the penalty here is so severe, and the whole picture in the case is so shrouded in mystery and suspicion, that, in my opinion, we would more nearly approximate our obligations, to wit, "to do substantial justice," by granting a new trial. *Now* it would be fairly simple to determine all the facts upon which a new court could justly and intelligently decide the issue.