UNITED STATES, Appellee

v.

Shapour MEGHDADI, Private First Class
U.S. Army, Appellant

No. 04-0042

Crim. App. No. 20000029

United States Court of Appeals for the Armed Forces

Argued October 13, 2004

Decided February 11, 2005

CRAWFORD, J., delivered the opinion of the Court, in which
GIERKE, C.J., EFFRON, BAKER, and ERDMANN, JJ., joined.

Counsel

For Appellant:  Captain Jeremy W. Robinson (argued); Captain
Lonnie J. McAllister II, Captain Kathleen D. Schmidt, Lieutenant
Colonel Mark Tellitocci, and Major Sean S. Park (on brief);
Colonel Mark Cremin, Colonel Robert D. Teetsel, and Captain
Charlie A. Kuhfahl.

For Appellee:  Captain Abraham F. Carpio (argued); Colonel
Steven T. Salata, Lieutenant Colonel Mark L. Johnson, and Major
Natalie A. Kolb (on brief).

Military Judges: Nancy A. Higgins and Jeffrey D. Smith

THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.

Judge CRAWFORD delivered the opinion of the Court.

Before a general court-martial on January 4-7, 2000, and contrary to his pleas, Appellant was convicted of conspiring to distribute cocaine, twice distributing cocaine, and using cocaine, in violation of Articles 81 and 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881 and 912a (2000).  The offenses all occurred at Fort Lewis, Washington, in July and August 1999.  On September 27, 2000, prior to authentication of the record of trial, and prior to the convening authority's action, Appellant requested a post-trial session under Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), seeking inquiry into alleged witness misconduct, or, alternatively, a mistrial or a new trial.  Lieutenant Colonel (LTC) Smith heard the evidence at the post-trial session and denied the motion.  The military judge who presided at trial (LTC Higgins) had been reassigned. After this hearing, on May 3, 2001, the convening authority approved the sentence of a bad-conduct discharge, three years' confinement, total forfeitures, and reduction to the lowest enlisted grade.

On October 17, 2002, Appellant filed a joint "Brief on Behalf of Appellant and Petition for New Trial" with the Army Court of Criminal Appeals.  The joint brief was rejected on procedural grounds and Appellant did not file a separate petition for new trial until August 20, 2003.  On September 23,

United States v. Meghdadi, No. 04-0042/AR

2003, the Court of Criminal Appeals affirmed the findings and sentence and denied Appellant's petition for new trial in a short-form opinion. United States v. Meghdadi, ARMY 20000029 (A. Ct. Crim. App. Sept. 23, 2003). We granted review of the first issue and specified issues two and three:

I. WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED WHEN IT DENIED APPELLANT'S REQUEST FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE AND FRAUD ON THE TRIAL COURT?

II. WHETHER APPELLANT'S FAILURE TO FILE THE PETITION FOR NEW TRIAL WITHIN THE TWO-YEAR PERIOD ESTABLISHED BY ARTICLE 73 DEPRIVED THE ARMY COURT OF CRIMINAL APPEALS OF JURISDICTION TO CONSIDER THE PETITION?

III. WHETHER THE MILITARY JUDGE ERRED WHEN HE DENIED APPELLANT'S MOTION FOR A POST-TRIAL ARTICLE 39(A) SESSION TO CONSIDER WHETHER APPELLANT SHOULD BE GRANTED A NEW TRIAL IN LIGHT OF CLAIMS OF NEWLY DISCOVERED EVIDENCE AND FRAUD ON THE COURT?

For the reasons set forth below, we conclude that the military judge erred in denying Appellant's motion for a post-trial session pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), to consider whether a new trial should be granted. Accordingly, we need not reach Issues I and II.

FACTS

Appellant's convictions for conspiring to distribute cocaine and twice distributing cocaine rested almost entirely on the testimony of Investigator Pereira (Pereira) of the Fort Lewis, Washington, Criminal Investigation Command (CID), and

3

Specialist Polanco (Polanco), an informant for the CID, who was recruited by Pereira shortly after Pereira arrested Polanco for drug offenses. At Appellant's trial, Pereira testified that in July 1999 he gave Polanco money to buy cocaine from Appellant. After Appellant showed Polanco a baggie containing a white powder, they went into a bathroom to avoid detection by casual observers. Polanco emerged without the money and with a baggie containing cocaine. Polanco corroborated Pereira's testimony. Additionally, Pereira was the only witness to the conspiracy and the August 1999 off-post cocaine distribution at the home of another soldier. Appellant's fingerprints were not found on the drug baggie allegedly purchased from him by Polanco, and the drug baggie allegedly purchased by Pereira was not tested for prints. In order for the members to have convicted Appellant of the crimes with which he was charged, they must have believed Polanco and, especially, Pereira. Pereira's credibility was key even when questioned by the members. The central theme of the defense was that Pereira and Polanco had lied. Specifically, the defense theory was that: (1) Pereira wanted to "make" numerous drug cases in order to advance his career; (2) Pereira had procured Polanco's assistance by promising Polanco assistance in his case, including that he would not go to jail if he helped CID; and (3) Polanco had "set up" Appellant (and others, by implication) so that CID agents would keep their

4

promises.  The findings establish that the members did not find the defense theory sufficiently compelling to dissuade them from determining, beyond a reasonable doubt, that Appellant was guilty.

About three months after Appellant's trial, consistent with his pleas made pursuant to a pretrial agreement, Polanco was convicted of two specifications of wrongfully distributing cocaine and one specification of wrongfully selling Prozac.  He was sentenced to a bad-conduct discharge, reduction to E-1, and a fine of $500.  His sentence did not include confinement.  In that case, Polanco's defense counsel asked the military judge to find that he had been granted immunity by the actions and promises of Pereira and other CID operatives.  During the hearing on that motion, the defense introduced a surreptitiously recorded audiotape of a conversation, purportedly occurring between Polanco and Pereira, after Polanco had been terminated as a CID confidential source.  Only Polanco and his defense counsel knew of the recording prior to Polanco's trial.

After Appellant's defense counsel had obtained a copy of Polanco's record of trial, he made a "Motion For Post-Trial 39(a) Session," for the "purpose of examining an allegation of misconduct by . . . Investigator (INV) Luis Pereira."  This motion requested several remedies, including "a new trial, based on newly discovered evidence and fraud on the court," and

advanced a detailed factual exposition with supporting exhibits. Appellant claimed that Pereira lied at Appellant's trial by testifying that: (1) he had not promised Polanco that Polanco would not go to jail if he helped CID; (2) he had not told Polanco that CID would assist him with his case if Polanco went to work for CID; and (3) he had not met with Polanco after Polanco had been terminated as a "registered source." The audiotape contains passages pertinent, in varying degrees, to all three claims. Appellant contends that had the tape been played at his trial, Pereira's credibility would have been so damaged that, when coupled with the inference that Polanco was implicating as many people as possible in order to get CID's help in reducing his own charges, the results of Appellant's trial would have been different.

During Appellant's trial, there was little evidence to corroborate Pereira's and Polanco's testimony implicating Appellant, and Pereira had made arguably evasive replies to several questions on cross-examination. Further, Pereira had admitted that he had not searched Polanco before the "controlled buy" Polanco made from Appellant, arguably supporting Appellant's suggestion that Polanco may have brought the "purchased" drugs with him. In acknowledging this failure, Pereira explained that because both Polanco and Appellant were present together when he arrived, such a search would have been

impracticable.  Although others were allegedly present at the second sale, only Pereira testified to the details of that transaction, which also yielded the only evidence of the conspiracy of which Appellant was convicted.  Although Pereira testified that he was wearing a "wire" during this second transaction, no recording was made due to an equipment malfunction.  Pereira testified that Appellant understood the important details of the conversation conducted in Spanish and English, notwithstanding that Appellant is Iranian and, according to the testimony of his sister and a coworker, speaks no Spanish.

As noted, LTC Smith had not observed either Polanco or Pereira testify at trial.  After considering the written submissions of the parties and reading a translated, unauthenticated transcript of the audiotape, LTC Smith denied the defense motion for a post-trial Article 39(a) session, for a mistrial, for a new trial, and to set aside two of the findings of guilty.

## DISCUSSION

We agree with the Government's assertion that "[m]ilitary service courts use their fact-finding powers to examine and contrast the testimony at trial with other post-trial submissions on motions for new trial."  Appellee's Final Brief at 9 (citing United States v. Brooks, 49 M.J. 64, 68 (C.A.A.F.

7

1998); United States v. Bacon, 12 M.J. 489, 492 (C.M.A. 1982)). Because the Court of Criminal Appeals elected summary affirmation, we lack the benefit of that court's fact-finding and rationale as to whether the military judge properly denied Appellant's request for a post-trial Article 39(a) session. Within the constraints of Article 67, UCMJ, 10 U.S.C. § 867 (2000), and consistent with our precedent, United States v. Siroky, 44 M.J. 394, 399 (C.A.A.F. 1996), we will pierce the intermediate level of appellate review and examine the military judge's ruling directly.

Rule for Courts-Martial (R.C.M.) 905(h) addresses written motions in general and provides, in part: "[u]pon request, either party is entitled to an Article 39(a) session to present oral argument or have an evidentiary hearing concerning the disposition of written motions." R.C.M. 1102(b)(2) and (d), specifically addressing post-trial Article 39(a) sessions, contain no similar language.

In United States v. Scaff, 29 M.J. 60 (C.M.A. 1989), we removed any substantive distinction between a military judge's authority to consider post-trial issues under R.C.M. 1102(b)(2) and R.C.M. 1210(f):

> If evidence is discovered after trial which would constitute grounds for a new trial under RCM 1210(f), this might be considered a "matter which arises after trial and which substantially affects the legal sufficiency of any findings of guilty or the sentence"

8

> within the meaning of RCM 1102(b)(2). However, even if the drafters of the Manual did not intend such an interpretation of this Rule, we still are persuaded that Article 39(a) of the Code empowers the military judge to convene a post-trial session to consider newly discovered evidence and to take whatever remedial action is appropriate.

29 M.J. at 65-66 (footnote omitted).

We have long recognized that petitions for a new trial "are generally disfavored," United States v. Williams, 37 M.J. 352, 356 (C.M.A. 1993), and that "granting a petition for a new trial in the military rests 'within the [sound] discretion of the authority considering . . . [that] petition.'" United States v. Bacon, 12 M.J. 489, 492 (C.M.A. 1982) (quoting United States v. Lebron, 46 C.M.R. 1062, 1066 (A.F.C.M.R. 1973)). "This Court has opined that requests for a new trial, and thus rehearings and reopenings of trial proceedings, are generally disfavored. Relief is granted only if a manifest injustice would result absent a new trial, rehearing, or reopening based on proffered newly discovered evidence." Williams, 37 M.J. at 356.

Although we have not directly addressed the standard to be applied in examining a military judge's denial of a request for a post-trial Article 39(a) session, we have held that "[w]hen an appellant requests the convening authority to order a post-trial Article 39(a) session, it is a matter for the convening authority's sound discretion whether to grant the request," United States v. Ruiz, 49 M.J. 340, 348 (C.A.A.F. 1998), and

that "[w]e review a military judge's ruling on a petition for a new trial for abuse of that discretion." United States v. Humphreys, 57 M.J. 83, 96 (C.A.A.F. 2002).

In denying a petition for a new trial, a military judge abuses his discretion "if the findings of fact upon which he predicates his ruling are not supported by evidence of record; if incorrect legal principles were used by him in deciding this motion; or if his application of the correct legal principles to the facts of a particular case is clearly unreasonable." United States v. Williams, 37 M.J. 352, 356 (C.M.A. 1993). While this standard is not facially applicable to the military judge's denial of Appellant's request for an Article 39(a) session, the fact that the request was made in the context of a motion for new trial compels our consideration of this analytical framework in assessing the military judge's factual and legal conclusions.

In denying Appellant's motion, the military judge misapprehended the purpose of the Article 39(a) session, made factual findings that are not supported by the record, applied an erroneous legal standard, misperceived the evidentiary value of the audiotape, and made no record of any weighing of the new evidence against the evidence at trial, either on the merits or in sentencing. Further, on an issue related entirely to witness credibility, the military judge declined the opportunity personally to hear the testimony of witnesses and, in the

process, denied counsel the opportunity to develop that testimony in an adversarial forum.  Viewing these circumstances in the aggregate, we conclude that the military judge's reasons and ruling were clearly untenable and that they constitute a prejudicial abuse of discretion.

    A.   Purpose of the Requested Post-Trial Session Under Article 39(a), UCMJ

After making factual findings, the military judge denied the relief requested by Appellant:

> A post-trial Article 39(a) session to examine defense counsel's allegations of misconduct by INV Periera is not warranted.  Other mechanisms, such as a commander's inquiry pursuant to R.C.M. 303 or an [Army Regulation] 15-6 investigation, are the proper means of conducting any such inquiry.

Despite Appellant's citation to R.C.M. 1102 and 1210 in his motion, the military judge failed to recognize that the primary purpose of the requested inquiry into witness misconduct was to examine Appellant's request for a mistrial or new trial, rather than to establish a basis for correction or discipline of the witnesses themselves.  This failure was compounded by his erroneous view of both the facts and the rules of evidence.

    B.  The Military Judge's Findings

Appellant disagrees with three aspects of the military judge's ruling:  his conclusion that the defense could have discovered the tape through due diligence; his conclusion that the voice attributed to Pereira on Polanco's tape did not tell

Polanco that Polanco's work for CID would help Polanco's case; and his conclusion that the remarks of Pereira on the tape could not be construed as an admission that Pereira had promised Polanco that he would not go to jail if he helped CID. For the reasons discussed below, we agree with Appellant.

First, the evidence does not support the military judge's finding that Appellant's defense counsel did not exercise due diligence in ascertaining the existence of the audiotape. The tape was made covertly by Polanco and delivered to Polanco's defense counsel, who secreted the tape until Polanco's trial so as to provide maximum effectiveness in impeaching Pereira during those proceedings. At Polanco's trial, Government counsel were surprised by the existence of the tape. As noted in the defense request for reconsideration, the issue of diligence was not even contested by the Government in its opposition to Appellant's post-trial motion. In view of the military judge's lack of familiarity with the witnesses, his declination to observe their demeanor, and the Government's apparent concession of the issue, there is little but conjecture to support the military judge's finding that "merely asking Polanco if he had any corroborating evidence concerning his allegations against Periera would have led to the discovery of the audiotape prior to Meghdadi's court-martial."

Second, the voice attributed to Pereira in the transcript of the audiotape says to Polanco: "You contributed for the CID to get so many drug dealers on the installation. If everybody see whatever you have done good before the incident, all this will help you." Nonetheless, the military judge found that "[n]owhere . . . does Pereira promise Polanco . . . that helping CID will help Polanco's case." This finding appears hypertechnical. The question is not whether the military judge believed a promise had been made, but whether a rational trier of fact could have found the newly discovered evidence of such a promise "sufficiently believable to make a more favorable result probable." Brooks, 49 M.J. at 69. Regardless of whether the military judge did more than merely rely on the absence of the word "promise" from Pereira's statement, he erred by concluding that a rational trier of fact, after hearing this evidence tested in an adversarial setting, could not have found that such a promise had been made.

As to whether Pereira had promised Polanco that Polanco would not go to jail, the military judge again applied an incomplete, if not incorrect, standard. Finding that the audiotape did not expressly contain such a promise, the military judge failed to consider whether, together with Polanco's testimony, Pereira's in-court denials, and other potential inconsistencies by Pereira, the audiotape (a portion of the

13

transcript of which is quoted below) could convince a rational

trier of fact that such a promise had indeed been made:

>    POLANCO: I'm going to do everything right, and my
>        woman is going to do everything okay.  I don't
>        want my mother to die.
>
>    PEREIRA: The truth is, I'm going to back up off my
>        word.
>                    [Tape inaudible]
>
>    PEREIRA:  You contributed for the CID to get so many
>        drug dealers on the installation.  If everybody
>        see whatever you have done good before the
>        incident, all this will help you.
>
>    POLANCO:  I hope so.  You always told me that I would
>        not go to jail.
>
>    PEREIRA:  Like I told the woman, you can say whatever
>        you want, but you're not going to f*** with me.
>        If you come and say all those things, who do you
>        think they're going to believe, you or me?  You
>        mentioned about your mother, and I'm worried
>        because I have my mother also, and I don't want
>        anything to happen, but everything is going to
>        get fine.
>
>    POLANCO:  If none of you go and testify on my behalf,
>        even the General is going to find out about me.
>        I am begging you for my mother.
>
>    PEREIRA:  I will do the impossible to show or talk on
>        your behalf based upon whatever you have done for
>        me.

Although not binding, the ruling of LTC Higgins, the

military judge in the courts-martial of both Polanco and

Appellant, who twice heard Polanco and Pereira testify and heard

the inflection and tone of voice used on the tape itself (noting

that the tape used a combination of Spanish and English), is

informative. LTC Smith summarized LTC Higgins's denial of Polanco's motion for a finding of immunity by saying "[t]he military judge did not find that INV Pereira and other CID agents promised Polanco he would not go to jail." However, what LTC Higgins actually said, in referring to Pereira and other CID Drug Suppression Team members, was:

> [t]hey made promises and secured the cooperation of a registered source who performed on his end of the bargain and they immediately began back pedaling when they realized that the assures [sic] they had given might be beyond their ability to comply with. They further minimized their involvement in making these assurances in their testimony before the court, and that is to put it charitably.

While LTC Higgins's determination of credibility is not dispositive, it certainly serves to underscore the necessity for a meaningful fact-finding inquiry and a detailed application of correct legal standards.

C. Evidentiary Value of the Audiotape

The military judge erroneously concluded that the audiotape would not be admissible. The military judge assumed that the taped conversation would be offered only under Military Rule of Evidence (M.R.E.) 608(b) and would be inadmissible as "extrinsic evidence." This conclusion inexplicably excludes both M.R.E. 608(c) and 613, neither of which requires the prior statement to have been probative of truthfulness and neither of which

15

prohibits introduction of qualifying extrinsic evidence under these facts.

M.R.E. 608(c) permits introduction of evidence, extrinsic or otherwise, tending to establish bias, prejudice, or motive to misrepresent on the part of a witness:

> Bias, prejudice, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced.

The tape recording, taken together with other evidence in this case, is relevant to a fact-finder's determination of whether Pereira and Polanco had motives to misrepresent:  Pereira, for professional gain and to prevent discovery of his arguably unauthorized investigational techniques; and Polanco, to stay out of jail and secure CID's help with his case.

As to M.R.E. 613(b), the military judge concluded that "defense counsel would have been stuck with the answers INV Periera provided at Meghdadi's court-martial, the very situation that actually occurred."  This conclusion would be correct if Pereira and Polanco admitted making their prior statements.  If they denied making the statements, or equivocated, M.R.E. 613 permits the extrinsic evidence of these statements.  See, e.g., United States v. Ureta, 44 M.J. 290, 298 (C.A.A.F. 1996); United States v. Button, 34 M.J. 139, 140 (C.M.A. 1992).  We hold that Appellant has firmly established the potential

impeachment value of the newly discovered statements and that their value was not considered by the military judge.

D.  Consideration of R.C.M. 1210(f)(3)

The military judge's ruling fails adequately to address Appellant's claim that the fraud on the court allegedly perpetrated by Pereira "had a substantial contributing effect on . . . the sentence adjudged."  R.C.M. 1210(f)(3).  By denying a post-trial session at which Pereira could be confronted with evidence of the audiotape by Appellant's counsel, and by instead relying on a translated, unauthenticated transcript, the military judge denied himself the opportunity for meaningful assessment of whether Peirera's trial testimony comprised perjury and, if so, whether the effect of the perjury substantially contributed to the sentence.  See United States v. Hester, 26 M.J. 299, 299 (C.M.A. 1988)("[W]e conclude that perjured testimony from the two witnesses . . . . constituted a fraud on the court . . . .");  United States v. Bourchier, 5 C.M.A. 15, 17 C.M.R. 15 (1954)(accused did not establish "proved perjury").  This failure is particularly salient in view of Appellant's complaint that he was sentenced far more harshly than Polanco; the fact that Pereira's credibility was questioned during his testimony for the Government, the defense, and the court; and the fact that Pereira was the Government's only sentencing witness.  Under such circumstances, evidence adverse

to Pereira's credibility deserved to be weighed against the evidence at trial before the military judge concluded, sub silentio, that the "fraud" did not have "a substantial contributing effect on . . . the sentence adjudged."

CONCLUSION

Called upon to examine a close question of credibility and presented with an audiotaped conversation, largely in Spanish, filled with innuendo, implication, and conversational nuance, a military judge who had not presided at either trial declined even to hear the witnesses testify, much less allow counsel to develop that testimony.

The military judge would have done well to follow the guidance of the military judge in Scaff, who noted:

> The purpose of my granting [the] request for a post-trial 39(a) session was to prevent a possible miscarriage of justice by providing for the securing of apparently extremely significant evidence at the earliest possible time. This session, I felt, would not only preserve the evidence, while still relatively fresh in the witness' memory, compared with the state of her memory at some future . . . hearing [pursuant to United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 41 (1967),] ordered by an Appellate Court, but would, in all likelihood, result in less cost to the Government.

29 M.J. at 62 (citation omitted).

We express no opinion on the question of whether Appellant is entitled to a new trial; however, we are satisfied that, given the evidentiary posture in which the request was presented, the failure to afford Appellant a forum in which to

18

make his case was error that materially prejudiced Appellant's substantial trial rights.

The decision of the Army Court of Criminal Appeals is reversed and the record of trial is returned to The Judge Advocate General for action not inconsistent with this opinion, to include a post-trial Article 39(a) session to consider Appellant's request for a new trial.