# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 38636**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Willie L. CURRY, Jr.**
Airman First Class (E-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 14 March 2017

———————————

*Military Judge:* Christopher M. Schumann.

*Approved sentence:* Dishonorable discharge, confinement for 10 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 14 November 2013 by GCM convened at Kirtland Air Force Base, New Mexico.

*For Appellant:* Major Isaac C. Kennen, USAF; Captain Allen S. Abrams, USAF; James. R. Trieschmann, Jr., Esquire.

*For Appellee:* Lieutenant Colonel Roberto Ramírez, USAF; Major Richard J. Schrider, USAF; Captain Tyler B. Musselman, USAF; Gerald R. Bruce, Esquire.

Before MAYBERRY, SANTORO, and SPERANZA, *Appellate Military Judges.*

Judge SANTORO delivered the opinion of the court, in which Senior Judge MAYBERRY and Judge SPERANZA joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

———————————

SANTORO, Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of drinking alcohol while under age 21 and, on the same occasion, raping and strangling Airman First Class (A1C) SM, in violation of Articles 92, 120, and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 920, 928.[1] The adjudged and approved sentence was a dishonorable discharge, confinement for 10 years, forfeiture of all pay and allowances, and reduction to E-1.

Appellant initially raised three assignments of error: (1) the military judge abused his discretion in denying a Defense request for a post-trial evidentiary hearing and/or new trial, (2) the record of trial was not substantially verbatim, and (3) the evidence is legally and factually insufficient to sustain the convictions for rape and assault consummated by a battery. We granted an unopposed Government motion to remand to the convening authority for correction of the record of trial and new post-trial processing. That has now been completed, mooting Appellant's second initial assignment of error.

Before us now, Appellant renews his first and third assignments of error and alleges three additional errors: (1) post-trial processing delays warrant relief, (2) the staff judge advocate's recommendation is either incorrect or the record of trial remains substantially incomplete, and (3) the military judge erred in his instructions to the members about proof beyond a reasonable doubt.[2] We agree that the post-trial processing of this case merits relief but reject Appellant's other assignments of error.

## I. BACKGROUND

Appellant and the victim, A1C SM, were both stationed at Kirtland Air Force Base, New Mexico. Between Christmas 2012 and New Year's Day, relatively few Airmen remained in the local area. The victim, Appellant, and others received text messages from friends asking if they were on base. A small group of Airmen then gathered at the victim's dormitory room to listen to music and drink alcoholic beverages. A1C SM consumed several beverages

---

[1] Appellant was found not guilty of breaking into A1C SM's dormitory room and forcibly sodomizing her.

[2] As the Court of Appeals for the Armed Forces recently decided this issue adversely to Appellant, *United States v. McClour*, 76 M.J. 23, 2017 CAAF LEXIS 51 (C.A.A.F. 24 January 2017), we do not separately address this issue here.

over the course of the evening and eventually became drunk, vomited, and was helped to bed by those at the party. Once she was in bed, everyone left her room and she went to sleep.

Appellant and Airmen MJ and JL went to Appellant's room (in the same dormitory) to continue the party. They had been in Appellant's room only a matter of minutes when Appellant left his room. Appellant went to A1C SM's room, gained entry, and strangled and raped her.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant argues that the evidence is legally and factually insufficient to establish that he strangled and raped A1C SM. We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (quoting *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). In applying this test, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001); *see also United States v. McGinty*, 38 M.J. 131, 132 (C.M.A. 1993).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of [Appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. The term reasonable doubt, however, does not mean that the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993).

The Prosecution's case was compelling. The victim testified that she and Appellant knew each other socially and had attended various functions together but that she was not interested in him romantically. She recalled waking up to Appellant standing next to her bed with his penis exposed. When she physically and verbally resisted, Appellant grabbed her, pulled her off the bed, and told her to remove her clothes. When she attempted to flee, Appellant hooked his arm around her neck, strangled her, and stopped her from

leaving. She made another attempt to flee and Appellant again stopped her by placing his arm around her neck. The victim could not recall whether Appellant told her to get on the bed or she "just knew [she] had to do it," but she got onto the bed. Appellant vaginally raped her, slapping her as she cried, and asking her "Is this rape, am I raping you?" The assault stopped when Appellant's penis dislodged the victim's birth control which fell from her vagina. With Appellant temporarily confused about what had happened, the victim fled into the bathroom she shared with her suitemate, locked the door, and remained there until she thought Appellant had left her room. When she emerged from the bathroom, she made several calls to friends and her supervisor asking for help. She eventually reached a fellow Airman who picked her up and got her to her supervisor's home.

The victim's testimony was corroborated by the other party attendees, the Airmen she called for assistance, her supervisor, and her supervisor's wife. In addition, one of the Airmen she called immediately after the assault preserved her voicemail plea for help. According to Airmen JL and MJ, who were both at the gathering in the victim's room, they and Appellant went to Appellant's room after they put the victim to bed. After they were in Appellant's room for a brief time, Appellant said he was going to go get a chair. Appellant left his room and never returned, so Airmen JL and MJ left. The Prosecution concluded its case with forensic evidence obtained during the victim's sexual assault examination and a search of Appellant's person. Medical and law enforcement personnel testified that the victim had bruising consistent with her reports of having been strangulated and Appellant's DNA was found under the victim's fingernails.

Appellant testified that he saw the victim in passing four to five times a week, often at the smoking area or with friends; the victim let him drive her car on one occasion; and they both went on a weekend trip to Los Angeles with three others to stay at the parents' home of a fellow Airman. He said that their first intimate encounter occurred on that Los Angeles trip while they were dancing and Appellant put his hand down her pants for a few seconds with no reaction from her. He recounted a later occasion in which he visited her dormitory room and sat on her bed as they listened to music. Appellant testified that the victim started rubbing his stomach, then his penis, and without any other discussion helped him take his pants off and performed fellatio.

Appellant testified that on the night of the alleged rape, he did not think the victim was drunk. He could not recall why he left his room while Airmen JL and MJ were there, but he went to the victim's room, knocked on her door, identified himself, and entered her room after she opened the door for him. After the victim rinsed her mouth out they sat together on her bed, began

talking, and engaged in consensual fellatio and vaginal sex which ended when Appellant dislodged her birth control. The victim ran into the bathroom so Appellant put his clothes on (without removing the condom he had been wearing) and left. When he returned to his room he removed the condom, put it in a trash bag, and immediately brought the trash bag to the dumpster.

If believed, the victim's testimony established each element of the offenses. Although we recognize our authority to find the victim not credible based simply on a cold reading of the record, the trial court was in a better position to make that assessment. *Washington*, 57 M.J. at 399. We agree with our Army colleagues who have noted that "the degree to which we 'recognize' or give deference to the trial court's ability to see and hear the witnesses will often depend on the degree to which the credibility of the witness is at issue." *United States v. Davis*, 75 M.J. 537, 546 (Army Ct. Crim. App. 2015) (en banc).

We cannot say that when viewing the evidence in the light most favorable to the Prosecution a reasonable factfinder could not credit the victim's testimony. We, therefore, conclude that the evidence is legally sufficient to support Appellant's convictions.

We have reviewed the evidence offered at trial, paying particular attention to the inconsistencies and arguments Appellant noted. None of the inconsistencies, either standing alone or taken together, cause us to believe that the victim's testimony was not credible. Giving appropriate deference to the trial court's ability to see and hear the witnesses, and after our own independent review of the record, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt.

### B. Request for Post-trial Evidentiary Hearing and/or New Trial

Appellant's court-martial was conducted in several sessions. Arraignment occurred on 27 June 2013. Members were initially empaneled on 3 September 2013, but the military judge excused the entire first panel for cause after a member disclosed in the group voir dire session knowledge of Appellant and/or A1C SM's attendance at the mental health clinic. A second panel was assembled on 5 September 2013. Following excusals, Captain (Capt) JM became the president of the court-martial and the court-martial recessed for two months. Trial on the merits was held from 12–14 November 2013. Sentence was adjudged on 14 November 2013 and the members were excused on that same date.

On 22 November 2013, Capt JM was randomly selected to provide a urinalysis sample as part of the Air Force's drug testing program. Capt JM's sample tested positive for oxycodone and oxymorphone. During the law enforcement investigation that followed, on 17 December 2013, Capt JM told

investigators that between August and October 2013 she had a screw inserted for a dental implant and was given a prescription of OxyContin. She was "relatively sure" she had destroyed the remaining pills once she no longer needed them. In November 2013, she experienced a back spasm and ingested what she thought was a Flexeril (cyclobenzaprine, a muscle relaxant) from a valid prescription. Capt JM told investigators that although she did not think she took oxycodone instead of Flexeril, she acknowledged it was possible. She also told investigators that her daughter lived with her and had mental health issues, to include suicidal ideations. No adverse action was taken against Capt JM.

Prosecutors provided this information to trial defense counsel. As will be discussed in more detail below, the preparation of the record of trial was significantly delayed and the record had not yet been authenticated by the military judge when trial defense counsel filed a motion for a post-trial Article 39(a), UCMJ, session and a new trial. Trial defense counsel argued that a post-trial Article 39(a), UCMJ, session was necessary so they could conduct additional voir dire with Capt JM about her daughter's condition and Capt JM's positive urinalysis result, as well as explore whether Capt JM escaped punishment because she had been the president of Appellant's court-martial (which, the Defense argued, raised the appearance of unlawful command influence). The motion for a new trial asserted three bases: (1) Capt JM was not truthful in her responses to the September voir dire questions, (2) the military judge should have conducted additional voir dire when court re-convened in November, and (3) command influence, as noted above, required a new trial.[3]

The military judge denied both requests. He concluded that the Defense failed to raise a colorable claim that Capt JM failed to answer voir dire questions honestly, there was no legal requirement to re-open voir dire after a continuance, and the Defense had raised no more than a "mere allegation or speculation" that command influence existed.

We review the military judge's denial of both motions for an abuse of discretion. *United States v. Meghdadi*, 60 M.J. 438, 441 (C.A.A.F. 2005). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion." *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000). "[O]n a mixed question of law and fact . . . a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995).

---

[3] Appellant has not renewed the claim of unlawful command influence on appeal.

**C. Truthfulness in Response to Voir Dire Questions**

Voir dire is critical to the fairness of a court-martial and Appellant's right to a fair trial is undermined "if panel members fail to answer material questions honestly during voir dire." *United States v. Sonego*, 61 M.J. 1, 2 (C.A.A.F. 2005) (citing *United States v. Mack*, 41 M.J. 51, 54 (C.M.A. 1994)). To obtain a new trial due to an incorrect juror response in voir dire, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 3 (quoting *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 556 (1984)). Although an evidentiary hearing is the usual procedure for determining whether a juror has provided a dishonest response, such a hearing is necessary only when there is a "colorable claim" of such dishonesty. *Id.* at 4.

Both below and before us, Appellant identifies two voir dire questions that he claims Capt JM answered dishonestly. The first was, "[D]oes any member know of anything of either a personal or professional nature which would cause you to be unable to give your full attention to these proceedings throughout the trial?" Capt JM answered no. Appellant argues that Capt JM was dishonest by failing to disclose that her daughter had mental health issues and also asserts (without evidence) that Capt JM was under the influence of oxycodone in September.

This question called for an inherently subjective response. There is no evidence, nor any basis upon which reasonably to speculate, that Capt JM's daughter's condition prevented her from performing military duties.[4] Even assuming arguendo that Capt JM was in pain or had ingested oxycodone in September, there is also no colorable claim that Capt JM's subjective belief that she could perform her duties was dishonest.[5]

The second allegedly dishonest answer was to the question: "Is any member aware of any matter which may raise a substantial question concerning

---

[4] We reject Appellant's argument that Capt JM, speaking for the entire panel, requested an evening recess at 6:43 p.m. on the second full day of trial, having also been in court until 6:09 p.m. the preceding day, is evidence that Capt JM was unable to perform her duties.

[5] Asking whether a witness, deponent, or juror has ingested substances, prescription or otherwise (to include alcohol), at or near the time of trial or deposition is a routine question in civil and criminal litigation. The parties' failure to ask a question that in hindsight might have yielded information of interest to them is not a basis for a new trial or appellate relief.

your participation in this trial as the [sic] court members?" Again, Capt JM answered "no." This question has both objective and subjective components. To answer affirmatively, the member must actually be aware of the matter(s) at issue and must subjectively believe that the matter might raise a substantial question as to her participation.

With respect to Capt JM's daughter's situation, we see no colorable claim that Capt JM attempted to deceive by answering "no." She was never asked whether anyone in her family had special needs, nor does the fact that some members in such a situation might answer affirmatively mean that those who do not are being deceitful. There was nothing to indicate that mental health concerns or suicidal ideations were or would be an issue in Appellant's case. Nor do we expect or require court members to reveal immaterial aspects of their family or private lives in response to such a vague question.

With respect to whether Capt JM should have disclosed that she had dental or back issues or had prescriptions for OxyContin and/or Flexeril, assuming arguendo that Capt JM had in fact taken either or both of those medications, there has been no colorable showing that she subjectively believed that taking those medications at her dentist's or physician's direction would necessarily raise a substantial doubt about her participation. Both in September and November, she was present for duty and not on convalescent leave, despite military medical providers' apparent knowledge of her physical condition and her prescription(s).

## D. Additional Voir Dire When Trial Resumed in November

Appellant next argues that the military judge erred and a new trial is warranted because he failed to conduct additional voir dire *sua sponte* when the court-martial resumed in November. Appellant cites no authority for this proposition, nor are we aware of any. We decline to establish a requirement that additional voir dire be conducted after a recess or continuance and instead leave this within the sound discretion of the trial judge. As Appellant never asked to conduct additional voir dire, and the military judge did not deny such a request, the military judge cannot have abused his discretion.

## E. Staff Judge Advocate's Recommendation

Appellant next raises two distinct but related claims with respect to the staff judge advocate's recommendation (SJAR) to the convening authority prior to the second action. He first contends that the SJAR erroneously stated that 108 pages were added to the record following our initial remand when in fact only 70 pages were added. In the alternative, he argues that if 108 pages actually were added to the record, the record before us is missing 38 pages and thus is not substantially complete. Appellant failed to comment on the

SJAR's statement about the number of pages added to the record in his response to the convening authority.

Appellant also argues that the staff judge advocate (SJA) gave erroneous advice to the convening authority in several respects. First, he claims that the SJA erred by telling the convening authority that Appellant "must 'show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision'" to merit relief for post-trial processing delays under our superior court's guidance in *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Second, he asserts that the SJAR failed to inform the convening authority about language contained in our initial remand order relating to the request for a post-trial Article 39(a), UCMJ, session. Finally, he argues that the SJAR failed to address his assertion that the record had still not been properly completed.

Proper completion of post-trial processing is a question of law which we review de novo. *United States v. Sheffield*, 60 M.J. 591, 593 (A.F. Ct. Crim. App. 2004) (citing *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)). Failure to comment in a timely manner on matters in the SJAR, or on matters attached to the SJAR, forfeits any later claim in the absence of plain error.[6] Rule for Courts-Martial (R.C.M.) 1106(f)(6); *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005). "To prevail under a plain error analysis, [Appellant bears the burden of showing] that: '(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right.'" *Scalo*, 60 M.J. at 436 (*quoting Kho*, 54 M.J. at 65).

With respect to the number of pages added to the record of trial, unlike when he submitted his initial assignments of error, Appellant does not actually claim that the record is incomplete or identify portions allegedly missing.

---

[6] Rule for Courts-Martial 1106(f)(6) and *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005), both indicate that waiver occurs when counsel fails to comment on matters in the staff judge advocate's recommendation (SJAR). However, our superior court's decision in *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009), recognizes that military courts had failed to "consistently distinguish between the terms 'waiver' and 'forfeiture.'" *Gladue* held that waiver is the "intentional relinquishment or abandonment of a known right," which precludes appellate review of an issue, while forfeiture is "the failure to make the timely assertion of a right" leading to plain error review on appeal (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)) (quotation marks omitted). Following *Gladue*, the term "forfeiture" should generally characterize the effect of a failure to timely comment on matters in the SJAR. *See United States v. Parker*, 73 M.J. 914 (A.F. Ct. Crim. App. 2014) (appellant forfeited, rather than waived, a claim that erroneous information was attached to the SJAR).

The Government submitted unrebutted affidavits with respect to this and the following assignment of error. The affidavits, which are more fully discussed below, establish to our satisfaction that the record before us contains the previously-missing pages and is substantially complete, and that the page count reflected in the SJAR was an administrative error. Moreover, Appellant has claimed no prejudice and we discern none from the record.

With respect to the standard used to determine whether Appellant merited relief for post-trial processing delays, the SJA accurately quoted from our superior court's decision in *Moreno*. Appellant argues that the SJA's excerpt of that language misled the convening authority into believing that he could not grant relief for the delay. We disagree; in fact, the addendum to the SJAR clearly stated it was the SJA's recommendation and advised the convening authority that he could take other action.

In our initial remand, we included a footnote reminding all parties that both the military judge and convening authority could order a post-trial Article 39(a), UCMJ, session while the case was back before them. We did not, however, direct that such a session be held. Appellant's assignment of error mischaracterizes our statement as saying that there would be a "benefit" to holding such a hearing. As this portion of our remand order did nothing more than note that R.C.M. 1102(d) authorized such a hearing, it was not error for the SJA not to comment on our order.

Finally, although Appellant now claims he complained to the convening authority that the record, even after remand, was still not complete, he did not. Appellant's response to the SJAR identified three legal errors: post-trial delay, the issues related to Capt JM, and alleged multiplicity and/or unreasonable multiplication of charges with respect to the rape and assault consummated by a battery specifications. Appellant's only comment about the state of the record of trial was found in the penultimate paragraph of appellate defense counsel's 16-page response to the SJAR, in which counsel summarizes his clemency request by stating, "At the heart of this request is a young service member who has been sitting in confinement since 2013, who's [sic] record has yet to be properly completed, and who's [sic] appeal has yet to be heard. Thus, we humbly request that you grant the relief requested." When taken in the context of the entire submission—which included a clearly-delineated list of alleged errors (of which this was not one)—we find that Appellant failed to raise this as an alleged error and that the SJA did not err in failing to comment on this assertion.

## F. Post-trial Processing Delays

Appellant's trial concluded on 14 November 2013. The convening authority took action on 8 July 2014, 236 days later. The case was docketed with us

on 30 July 2014, 22 days after action. We remanded the case on 23 October 2015, 450 days after docketing. The military judge issued a certificate of correction on 4 January 2016, 73 days after remand and 781 days after trial. The convening authority took action for the second time on 4 May 2016—121 days after the military judge's certificate of correction, 194 days after our remand, and 902 days after trial. The case was returned to us on 23 September 2016, 142 days after the second action, 337 days after we remanded the case, and 1,044 days after trial. As of the date of our decision, over 1,200 days have elapsed since Appellant's trial.

Convicted Airmen have a due process right to timely review and appeal of courts-martial convictions. *Moreno*, 63 M.J. at 135. Accordingly, we review de novo Appellant's claim that he has been denied his due process right to a speedy post-trial review and appeal. *Id.*

In *Moreno*, our superior court established a presumption of unreasonable post-trial delay that requires a due process review when the convening authority does not take action within 120 days of trial, when a record of trial is not docketed with us within 30 days of the convening authority's action, and when we do not render a decision within 18 months of the case's docketing. *Id.* at 142.

If there is a *Moreno*-based presumption of unreasonable delay or an otherwise facially-unreasonable delay, we examine the claim under the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135. *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted).

"We analyze each factor and make a determination as to whether that factor favors the Government or the appellant." *Id.* at 136. Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533) ("Courts must still engage in a difficult and sensitive balancing process."). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* Or, to put it differently, the absence of prejudice does not preclude a finding that a due process violation occurred. Using this structure, we now analyze Appellant's claims.

The existence of at least one presumptively-unreasonable delay triggers a full due process review under *Moreno*. Additionally, we find the more than 1,200 days of overall delay in this case facially unreasonable, also triggering

a full due process review. This egregious delay weighs heavily in Appellant's favor.

In response to Appellant's claims, the Government submitted affidavits from personnel involved in post-trial activities related to this case. Taken together, the affidavits paint the picture of a base legal office that was not adequately staffed to perform its mission, insufficiently trained and supervised, or both. For example, it took court reporting personnel 180 days to present the (initial, incomplete) transcript to the military judge for authentication. As another example, it took 142 days to assemble the record of trial following the second action, in large part because those responsible for re-assembling the record were unable to locate critical documents.

Appellant asserts that he has been prejudiced by this delay in two ways. First, he claims that the Government has, by its dilatory processing, delayed appellate resolution of his case. We do not find that this argument constitutes prejudice per se, as this is exactly what the *Moreno* post-trial processing standards were designed to address—otherwise, every delay beyond the *Moreno* time standards would constitute prejudice.

Second, he claims that the delay has caused him "anxiety and concern" and that he has lost several family members during his incarceration. While we certainly do not minimize the emotional impact of the loss of a family member, and recognize that the anxiety an appellant may experience should not be measured against whether his appeal is successful, he has nonetheless failed to establish "particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Moreno*, 63 M.J. at 140.

In weighing and balancing the *Barker* factors, we easily conclude, as noted above, that the length of the delay and reasons for the delay weigh heavily in Appellant's favor. His assertion of his right to speedy appellate review also weighs in his favor.[7] Although the lack of constitutionally-cognizable prejudice resulting from the delay weighs in the Government's favor, on the whole we are convinced that the unnecessarily-dilatory processing of this case violated Appellant's due process rights and warrants relief. *See United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006) (unreasonably lengthy delay, no jus-

---

[7] The Government correctly notes that much of the appellate delay, and some of the trial-level delay, resulted from Appellant's requests for enlargements of time to submit appellate and clemency matters. We have considered the totality of the circumstances in determining the appropriate relief.

tifiable reason for the delay, and assertion of right to speedy trial sufficient to overcome lack of prejudice).

Even in the absence of prejudice, "we are mindful of the egregious delay in this case and the adverse impact such delays have upon the public perception of fairness in the military justice system." *Id.* at 363. We have no doubt that the unreasonably dilatory processing of Appellant's case would cause a reasonable person to question the fairness of our system and cannot be ignored. We therefore reassess Appellant's sentence to a dishonorable discharge, confinement for nine years and six months, forfeiture of all pay and allowances, and reduction to E-1.[8]

### III. CONCLUSION

The findings of guilt and the sentence, as reassessed, are correct in law and fact and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence, as reassessed, are **AFFIRMED**.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court

---

[8] We have separately evaluated Appellant's claims under our Article 66(c), UCMJ, 10 U.S.C. § 866(c), authority to grant relief even in the absence of prejudice. *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002); *see also United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006) (finding delays were such that "tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system"). Had we not decided this case based on *Moreno* and constitutional due process, we would have granted identical relief under our Article 66(c) authority.