# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, FEBBO, and SCHASBERGER
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Master Sergeant JOHN T. LONG**
**United States Army, Appellant**

ARMY 20150160

Headquarters, United States Army Special Operations Command
Deidra J. Fleming, Military Judge (arraignment)
Christopher T. Fredrikson, Military Judge (trial)
Lieutenant Colonel Charles L. Pritchard, Jr., Acting Staff Judge Advocate

For Appellant: Lieutenant Colonel Christopher D. Carrier, JA; Captain Cody D. Cheek, JA: William E. Cassara, Esquire (on brief and reply brief).

For Appellee: Lieutenant Colonel Eric K. Stafford, JA; Major Michael E. Korte, JA; Captain Marc B. Sawyer, JA (on brief).

26 October 2018

--------------------------------
MEMORANDUM OPINION
--------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

MULLIGAN, Senior Judge:

Master Sergeant (MSG) John T. Long appeals his convictions of ten sexual offenses and two non-sexual offenses committed against three separate victims over the course of more than five years.[1] We are compelled to set aside most, but not all, of appellant's convictions.

---

[1] A military judge, sitting alone as a general court-martial convicted appellant, contrary to his pleas, of three specifications of abusive sexual contact with a child, two specifications of indecent liberties with a child, rape of a child, sodomy upon a child under twelve years of age, assault consummated by a battery upon a child under sixteen years of age, two specifications of indecent acts with a child, child endangerment, and sexual abuse of a child, in violation of Articles 120, 125, 128,

(continued . . .)

Appellant presents three issues,[2] which we will address in the following order: First, appellant argues essentially all his convictions are factually insufficient. Second, appellant argues the military judge abused his discretion by failing to grant a new trial due to purportedly exculpatory evidence, "discovered" after appellant's trial. Third, appellant argues the military judge erred by considering charged sexual misconduct to show appellant had a propensity to commit other charged sexual misconduct—i.e. the error identified in *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016) and *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017).

To summarize our rulings on appellant's assignments of error: First, we find two of appellant's convictions are not factually sufficient, but the remaining convictions are factually sufficient. Second, we conclude the military judge did not abuse his discretion by denying appellant's motion for a new trial. Third, all but one of appellant's convictions for sexual offenses must be set aside. The military judge erred by considering charged misconduct for its tendency to show the appellant's propensity to commit other charged misconduct. For all but one of appellant's convictions, this error was not harmless beyond a reasonable doubt. In fact, the government conceded this on brief. The evidence supporting appellant's conviction for raping his own eleven-year-old daughter after plying her with hard liquor and choking her until she passed out is so strong, however, that we find any use of impermissible propensity evidence was harmless beyond a reasonable doubt.

We affirm MSG Long's convictions of three specifications: child endangerment for encouraging his eleven-year-old daughter to become drunk on hard liquor, which appellant provided her—Specification 5 of Charge I; assault consummated by battery for choking her—The Specification of Charge IV; and rape

---

(. . . continued)
and 134, Uniform Code of military Justice (UCMJ), 10 U.S.C. §§ 920, 925, 928, and 934 (2006) and Article 120b UCMJ, 10 U.S.C. § 920b (2006 & Supp V 2012). The military judge also found appellant not guilty of several alleged offenses, both sexual and non-sexual, against both adults and children. The military judge sentenced appellant to a dishonorable discharge, sixty years confinement, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

[2] Appellant also personally raised multiple issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). Several of the issues appellant raised are essentially duplicative of the issues raised by his counsel on brief, which we address in this opinion. Appellant's other issues raised under *Grostefon* do not merit further discussion or any additional relief.

of a child for penetrating her vulva with his penis as she lost consciousness from the alcohol, choking, or both—Specification 8 of Charge II.

## BACKGROUND

The tale of appellant's alleged misconduct is long and sordid. We shall limit our recitation of these disturbing facts to that which is necessary to our analysis.

Appellant had four children by three women: a son;[3] his sister, JL; their half-sister, AL, and another half-sister by a different mother, YH. AL had a half-brother from another father, TW. AL and TW's mother was NB. Also relevant to our discussion, is appellant's son's female cousin, SC.

Appellant was convicted of sexual offenses against JL, AL, and SC. At the time of those offenses, from 2007 through 2012, JL, AL, and SC were children. JL and AL were close in age—born less than five months apart in mid-1998. SC was born in mid-1995.

### A. Appellant's Misconduct

In relevant part, appellant was convicted of one specification of touching AL's genitals and one specification of forcing her to touch his penis in 2007. He was also convicted of one specification of forcing AL's mouth over his penis in 2007. At the time, AL was nine years old.

Appellant was also convicted of one specification of child endangerment for providing AL hard liquor on New Year's Eve, 2009. He was convicted of assault consummated by a battery for choking her while laying on top of her while she was drunk. He was further convicted of raping AL, who was then eleven years old.

Appellant was convicted of three specifications of touching SC on the back, buttocks, and breasts with the intent to arouse his own sexual desire in 2009, when SC was approximately fourteen years old.

---

[3] Appellant's son's initials are also "AL." To prevent confusion with appellant's daughter, AL, we refer to him only as appellant's son.

Appellant was convicted of three specifications of fondling JL's breasts and touching her with his penis in 2011 and 2012. At the time, JL was approximately thirteen to fourteen years old.[4]

The majority of appellant's misconduct was discovered when JL and AL walked into a local police station in August 2012 to report that appellant had sexually abused them.

*B. Appellant's Trial*

Prior to trial, the government provided notice that it intended to offer evidence under Military Rules of Evidence (Mil. R. Evid.) 413 and 414, to show the appellant had a propensity to commit sexual offenses. While Mil. R. Evid. 414 is limited to evidence of other sexual offenses against children, Mil. R. Evid. 413 allows evidence of other sexual offenses in general to show an accused's propensity to commit sexual offenses. All the evidence referenced in the government's notice was evidence of charged offenses.

The government filed a motion to rule on the admissibility of certain Mil. R. Evid. 413 evidence related to uncharged[5] misconduct. The government did not file any other motions regarding Mil. R. Evid. 413 or 414 evidence. Appellant filed a motion to exclude the uncharged Mil. R. Evid. 413 evidence, but did not file any motions to preclude other Mil. R. Evid. 413 or 414 evidence. The military judge limited his consideration of the uncharged Mil. R. Evid. 413 evidence to certain offenses against adults, of which appellant was ultimately acquitted. The military judge did not discuss his consideration of any other Mil. R. Evid. 413 or 414 evidence, other than to later clarify the government could also argue evidence supporting other previously dismissed charges demonstrated appellant's propensity to commit sexual offenses against children.

The government referenced propensity in response to a blanket Rule for Courts-Martial (R.C.M.) 917 motion by appellant to dismiss all charges and specifications after the close of the government's case in chief. The military judge dismissed one charge pursuant to R.C.M. 917 because the wrong date range was charged, and the judge found amending the date range would have been a major

---

[4] Appellant was also charged with several sexual offenses against adult women, of which he was acquitted.

[5] Some of the conduct was originally charged, but those charges were dismissed after arraignment but prior to pleas.

change over defense objection. The military judge did not refer to propensity when he denied the defense motion to dismiss all other charges.

The government did not explicitly refer to propensity in the government's closing argument. The government referred to appellant has having a "victim tree," referring to the mostly-familial relationships between appellant and his various alleged victims.[6] When discussing a charge of enticing prostitution, of which appellant was later acquitted, the government stated, "it's Master Sergeant Long and he does what Master Sergeant Long does." The government's closing summary said of appellant: "This is not a man who takes [']no['] for an answer. This is not a man who listens to anything, to anyone, and certainly not to his family."

Most of the specifications of which appellant was convicted were proven entirely by testimony of the single victim named in each specification. Nevertheless, the testimony of JL, AL, and SC was compelling, candid, and credible. The evidence surrounding the rape of AL was substantially more robust. Two witnesses, in addition to AL, corroborate the circumstances surrounding appellant's rape of AL and appellant's other crimes leading up to his rape of AL.

*1. NB's Testimony*

NB, AL's mother, testified she was in a long-term sexual relationship with appellant. Appellant would sometimes choke NB during sexual intercourse. This behavior became more aggressive after a fight NB had with appellant in late 2009. Appellant would become angry if NB did not want to have sex with him. By New Year's Eve, 2009, NB had not had sex with appellant "for a while." Appellant was further upset that NB was working on New Year's Eve, and that she did not plan on spending the night with him.

NB worked at a liquor store. On New Year's Eve, appellant went to the same liquor store at which NB worked and, to NB's recollection, purchased "two half-gallons of alcohol" from NB. NB believed one of the bottles was of lemonade mixed with vodka, the other was of pure vodka. NB did not return home on New Year's Eve, but stayed at a relative's residence.

---

[6] The term "victim tree" appears to correspond to the wire diagram used by the government in opening and closing statements. The wire diagram depicts the relationships between various individuals relevant to the case, and how they were related to appellant. Most of the individuals so depicted were named as alleged victims of offenses with which appellant was charged.

NB arrived home the morning of New Year's Day. Upon arriving home, NB discovered her two children, eleven-year-old AL and sixteen-year-old TW, and appellant, were "hung over" and the house smelled of alcohol and vomit. She found both the bottles of alcohol appellant had purchased the previous day on the dining room table—empty.

NB found vomit "everywhere" in AL's room. She testified AL was crying "a lot." NB saw bruises "around her neck" and "on her legs." NB testified that, based on the shape of the bruises on AL's neck, "you could tell it was done by hands." NB testified that AL reported "her body was sore," "she was hurting all over," and specifically, "her butt hurt." NB testified AL "didn't want [NB] to touch her" and "wouldn't talk to [NB] about anything." NB testified she took her children to a relative's residence the same day because "AL didn't want to be there anymore."

### 2. TW's Testimony

AL's half-brother, TW, was sixteen years' old on New Year's Eve, 2009. TW testified that appellant drove to the liquor store at which NB worked and purchased two bottles of vodka. TW confirmed that he, appellant, and AL consumed a half-bottle of vodka together. According to TW, the bottles were "fifths"[7] of vodka, not half-gallons. After AL could drink no more, appellant and TW consumed the rest of the first bottle of vodka and some of the second bottle of vodka. TW confirmed one of the bottles of vodka was lemon-flavored.

TW testified that he and appellant carried AL to her room because she was "being drunk." TW left AL's room and fell asleep in his own room while appellant was still "trying to get her to calm down and go to sleep." Before falling asleep, TW vomited "everywhere" in his room. The next morning, TW awoke "hung-over" and testified his sister was "crying," and "really upset." TW did not see bruises on AL's neck or legs.

### 3. AL's Testimony

AL testified she consumed alcohol with appellant and TW on New Year's Eve, 2009. Appellant either told AL to go to her room, or personally took her to her room because she was acting "belligerent." AL testified she fell asleep in her room and awoke when appellant "got on top of [her] and started to choke [her]." AL lost

---

[7] A "fifth" refers to a fifth of a gallon, a traditional size for bottles of distilled spirits in the United States. One-fifth of a gallon is equal to approximately 757 ml, and the term "fifth" is commonly used to refer to the now-standard 750 ml bottle of alcohol.

consciousness, then awoke again to appellant still on top of her and choking her. She lost consciousness yet again, and did not awake again until the next morning. When she awoke, AL felt pain "[i]n [her] vagina and [her] butt." AL testified it "burned" when she urinated. AL further testified she found dried blood "all over [her] vagina and [her] butt." AL had not begun menstruating at the time, and did not begin menstruating until she was in the seventh grade. She also reported bruises on her neck and legs.

### 4. The Defense Witness

A defense witness, Mr. GH, testified that he arrived at appellant's residence the morning of New Year's Day, 2010. Mr. GH claimed he saw essentially nothing amiss as he spoke with AL for a few minutes before removing himself to appellant's basement, where he was temporarily living.

In late 2009 and early 2010, Mr. GH was a Staff Sergeant in appellant's Special Forces unit, and was temporarily living in appellant's basement prior to an anticipated deployment. Mr. GH was also helping appellant build a daycare facility appellant intended to open as a side business. Mr. GH indicated he would work on the construction of appellant's daycare center during what most in the U.S. Army would describe as normal duty hours. Mr. GH did not provide appellant any rent and did not receive any payment for his construction work. Mr. GH denied there was any agreement between him and appellant to trade rent for work. Mr. GH was not present at appellant's residence on New Year's Eve, and testified that he was in the main part of appellant's house for a few minutes on New Year's Day before returning to his basement living quarters.

### C. The Missing Videos

At trial, appellant claimed that JL and AL fabricated the allegations against him because they were upset that appellant disciplined them for teenage misbehavior. Specifically, appellant found several videos recorded by JL, AL, and his son, showing the three half-siblings bullying and physically abusing their youngest half-sister, YH. Of particular concern, the three older children used a "shock knife" to deliver electric shocks to YH.

Army Criminal Investigative Command (CID) recovered one video of AL, JL, and appellant's son bullying YH. The video was recovered during a forensic analysis of appellant's computer, which remained under CID control as evidence. The government provided appellant's defense counsel the video CID recovered and provided them access to the entire case file at CID offices. Unbeknownst to CID or the prosecution team, there were several other videos of the three half-siblings bullying YH on appellant's computer, which CID did not recover prior to trial. The

other videos were shorter than the one CID found, and did not depict use of the "shock knife."

In the middle of trial, appellant's counsel sent a private investigator, Mr. CC, to CID offices to try to find the other videos. Mr. CC, however, was not a computer expert and was unable to navigate the digital forensic media that CID possessed. CID agents told Mr. CC he was not permitted to access appellant's actual computer—because it would potentially alter the digital evidence thereon—but they explained how Mr. CC could request access to a forensic duplicate of appellant's computer. In the end, Mr. CC did not go through the process for requesting a forensic duplicate, but instead asked CID to look for "torture" videos and left. A CID agent subsequently left Mr. CC a message stating there were no such videos found.

After trial, one of appellant's attorneys sat down with a CID agent and recovered the additional videos after spending about half an hour looking for them. Appellant moved for a new trial under the theory that the videos constituted newly discovered evidence and the failure of CID to provide them earlier constituted fraud on the court-martial. The military judge took evidence and argument in a post-trial Article 39(a) hearing. Appellant testified at the post-trial hearing. He claimed that, had his defense team possessed the additional videos, he would have testified in his own defense at his court-martial. Appellant testified that he felt the videos were needed to support his testimony about the "family dynamics" at the time AL and JL reported his sexual abuse. Ultimately, the military judge denied appellant's motion in a ruling supported by detailed findings of fact.

*D. Appeal*

Appellant challenges the factual sufficiency of essentially all his convictions. He further challenges the military judge's denial of his motion for a new trial. Finally, and most importantly, appellant argues the military judge committed the same error at issue in *Hills* and *Hukill* by considering evidence of charged misconduct for its tendency to show appellant had a propensity to commit other charged misconduct.

The government concedes that certain language must be struck from two specifications alleging appellant inappropriately touched SC. Otherwise, the government maintains appellant's convictions are factually sufficient. The government also argues the military judge did not abuse his discretion by denying appellant's motion for a new trial.

The government concedes the issue of *Hills* error. The government further concedes it cannot show the error was harmless beyond a reasonable doubt for any specification of a sexual offense except for appellant's rape of AL. The government

argues the evidence supporting appellant's rape of AL was so strong, however, that any *Hills* error was harmless beyond a reasonable doubt.

## LAW AND DISCUSSION

We address appellant's assigned errors in the following order: first, factual sufficiency; second, the military judge's denial of appellant's motion for a new trial; and third, *Hills* error.

### A. Factual Sufficiency

We may affirm only those findings of guilty that we find correct in law and fact and determine, based on the entire record, should be affirmed. UCMJ art. 66(c). We review both legal and factual sufficiency de novo.[8] *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007). Our test for factual sufficiency is, "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are [ourselves] convinced of the [appellant's] guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

We give no deference to the decision of the trial court except that we "take into account the fact that the trial court saw and heard the witnesses" and we have not. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "[T]he degree to which we 'recognize' or give deference to the trial court's ability to see and hear the witnesses will often depend on the degree to which the credibility of the witness is at issue." *United States v. Davis*, 75 M.J. 537, 546 (Army Ct. Crim. App. 2015) (en banc), *aff'd on other grounds*, 76 M.J. 224 (C.A.A.F. 2017).

Appellant argues essentially all his convictions are factually insufficient.[9] We find two specifications must be set aside because we are not ourselves convinced of appellant's guilt of those offenses beyond a reasonable doubt. We are personally

---

[8] We review every case for legal and factual sufficiency. On brief, appellant challenged both the legal and factual sufficiency of his convictions, but focused on factual sufficiency. We too focus on factual sufficiency as, at least in this case, the issue of factual sufficiency necessarily encompasses the issue of legal sufficiency.

[9] On brief, appellant addresses each specification of which he was convicted. Appellant's arguments with regard to Specification 5 of Charge I, child endangerment by providing alcohol to minors, appears limited to challenging certain language in the specification. Otherwise, appellant takes issue with the factual underpinnings of every specification.

convinced of appellant's guilt of all remaining specifications beyond a reasonable doubt, and find them factually sufficient. We will address the two faulty specifications first, then turn to the specifications related to the rape of AL, and finally address all remaining specifications.

### 1. The Alleged Indecent Liberty with SC

Specification 6 of Charge II alleged appellant "engage[d] in indecent conduct in the physical presence of [SC], a child under 16 years of age, by straddling her body and massaging her back beneath her clothing, with the intent to arouse the sexual desire of [appellant]."

On brief, appellant and the government agree there was no evidence offered that appellant straddled SC or touched her under her clothing. The government suggests that we may affirm appellant's conviction for this specification after excising the relevant language. Absent the excised language, however, the specification merely alleges appellant massaged SC's back over her clothes. Put simply, this is not "indecent conduct,"[10] at least not under the facts before us. The government attempts to remedy this by pointing out that SC testified that appellant went on to massage her buttocks, and massaging her buttocks would be quite indecent indeed. This may be true, but it was not charged. We decline to affirm appellant's conviction on a theory not alleged.

Specification 5 of Charge II also fails due to a lack of evidence supporting the charged language. Specification 5 alleged appellant "engage[d] in indecent conduct in the physical presence of [SC], a child under 16 years of age, by pressing his body against hers and touching her back with his hands under her shirt, with the intent to arouse the sexual desire of [appellant]." On brief, appellant observed and the government conceded that there was no evidence appellant touched SC under her shirt during the incident in question. While the fact appellant pressed his body against SC lends slightly more weight to this allegation than exists for Specification

---

[10] "Indecent conduct" was a defined term under the version of Article 120 in effect for the time range charged in Specifications 5 and 6 of Charge II. "Indecent conduct" was defined as, "that form of immorality relating to sexual impurity that is grossly vulgar, obscene, and repugnant to common propriety. . . ." Art. 120(t)(12) (2006). Indecent conduct and the intent to arouse appellant's sexual desire are independent elements of the offense of indecent liberty with a child. Art. 120(j) (2006). As such, even if the government can prove appellant massaged SC's back with the intent to arouse his sexual desire, it must also show massaging her back was indecent in and of itself.

10

6, on balance, we cannot say we are convinced beyond a reasonable doubt that appellant committed the offense of indecent liberty as alleged in Specification 5.

## 2. *The Rape of AL*

The evidence proving appellant raped eleven-year-old AL is overwhelming. AL, TW, and NB all testified credibly and confirm appellant purchased two bottles of vodka on New Year's Eve, 2009. AL and TW testified about how appellant encouraged them to drink alcohol by drinking it with them in a game where they took turns taking shots of vodka from different sized glasses. NB confirmed that, by the time she returned home the next day, the two bottles were empty. All three witnesses confirmed that AL and TW vomited copiously as a result of drinking.

TW testified credibly that he left appellant in AL's room, believing appellant was trying to get AL to go to sleep. AL explained how she awoke to appellant on top of her and choking her. NB confirms that AL had bruises on her neck and legs the next morning. NB testified the bruises were clearly made by hands around AL's neck.

AL testified credibly that, when she awoke, she found dried blood "all over" her genital area. AL testified that her vagina and "butt" were sore, and she felt burning pain when she urinated. It is little surprise that no one else saw the dried blood, as AL explained she was wearing shorts. NB confirmed that AL reported she was "hurting all over" and specifically "her butt hurt." TW and NB both describe AL as extremely upset the morning of New Year's Day, and NB testified AL did not want to be physically touched and did not want to talk about what had happened to her.

Although Mr. GH testified that he saw nothing amiss at appellant's house the morning of New Year's Day, 2010, we do not find Mr. GH's testimony credible. Mr. GH was appellant's subordinate. He plainly admired appellant and, despite his denials, he appeared to be in some sort of quid-pro-quo arrangement with appellant, trading rent for work—during duty hours. Mr. GH's identity and interests were simply too entangled with appellant for objectivity, and his characterization of his work with appellant undermines our confidence in his candor. In short, we find Mr. GH was biased and not candid.

Based on the compelling testimony of AL, TW, and NB, we have no difficulty whatsoever concluding, beyond any reasonable doubt, that appellant is guilty of child endangerment, assault consummated by a battery, and rape of a child.

### 3. The Remaining Specifications

We find all the remaining specifications are factually sufficient, and we are ourselves convinced of appellant's guilt beyond a reasonable doubt. All the remaining specifications were proven on the strength of each victim's individual testimony alone. The strength of one witness's testimony may, in some cases, be sufficient to sustain a conviction. We have weighed the evidence and taken into consideration the fact the trial judge saw and heard the witnesses and we have not. We find the testimony of AL, JL, and SC credible and candid. We are ourselves convinced of appellant's guilt of the remaining offenses beyond a reasonable doubt.

### B. The Motion for a New Trial

The Rules for Courts-Martial permit a new trial "only on grounds of newly discovered evidence or fraud on the court-martial." R.C.M. 1210(f)(1). A new trial may not be granted based on newly discovered evidence unless: (1) "the evidence was discovered after the trial;" (2) "the evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence;" and (3) "the newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused." R.C.M. 1210(f)(2). A new trial may not be granted based on fraud on the court-martial "unless it had a substantial contributing effect on a finding of guilty or the sentence adjudged." R.C.M. 1210(f)(3).

We review a military judge's ruling on a motion for a new trial for an abuse of discretion. *United States v. Webb*, 66 M.J. 89, 92 (C.A.A.F. 2008). A military judge abuses his discretion by denying a petition for a new trial "if the findings of fact upon which he predicates his ruling are not supported by evidence of record; if incorrect legal principles were used by him in deciding this motion; or if his application of the correct legal principles to the facts of a particular case is clearly unreasonable." *United States v. Williams*, 37 M.J. 352, 356 (C.M.A. 1993) (citations omitted). *See also United States v. Maghdadi*, 60 M.J. 438, 441 (C.A.A.F. 2005) (citing *Williams*, 37 M.J. at 356).

In this case, the military judge made detailed findings of fact that are well-supported by the record, and he applied the correct legal principles to decide appellant's motion. Further, his application of the law to the facts of this case was eminently reasonable.

As the military judge correctly found, throughout trial, appellant's theory of the case was that AL and JL fabricated their reports of sexual abuse by appellant because he had disciplined them after discovering the videos of AL, JL, and appellant's son bullying YH. Appellant also argued at trial that JL's abuse of YH undermined her testimony that part of her reason for reporting appellant's sexual

abuse was to protect YH from ever becoming one of appellant's victims in the future.

The military judge also found that the government provided appellant a copy of the results from the full CID digital forensic examination (DFE). This copy of the DFE included the longest and most extreme video of bullying, which was also the only video involving use of the "shock knife." The military judge found that this was the only video of which the prosecution team and CID were aware before or during trial.

The military judge found that before, during, and after trial, the defense believed additional videos existed on digital media devices seized by CID. In fact, appellant personally testified at the post-trial hearing that he was aware of the existence of the other videos at all relevant times. Despite the fact that the trial counsel had been responsive to appellant's prior discovery requests, appellant's defense team never requested trial counsel's assistance in finding the additional videos. The military judge further found the defense team should have been aware that they were not provided with full copies of the various digital media devices—as opposed to the more limited results of the DFE. Nevertheless, the defense team never specifically requested the trial counsel's assistance in gaining access to full copies of the digital devices.

Mr. CC requested to review the CID case file before appellant's trial to ensure the defense team had the entire file. CID gave Mr. CC access to the entire file, but he did not ask for access to the digital electronic devices seized as evidence. Later, in the middle of trial, Mr. CC returned to CID to attempt to access appellant's computer. The defense team never requested the trial counsel's assistance in arranging this meeting with CID, or facilitating access to any evidence.

When he returned to CID's offices, Mr. CC did not request access to a forensic image or copy of appellant's computer. Rather, he requested access to the original computer, which CID declined. Instead, CID agents explained to him how to request access to a forensic copy of the computer through the trial counsel. Instead of requesting access to a forensic copy, the defense investigator asked a CID agent to check to see if there were any other "torture" videos. The CID agent did not conduct any further examination of the original devices, or the forensic copies thereof, but later left a voice message with the defense investigator that there were no such videos.

After trial, one of appellant's defense counsel met with CID, and assisted a CID agent in finding the missing videos of AL, JL, and appellant's son bullying YH. The military judge found that the relevance and allegedly exculpatory nature of the videos would not have been readily apparent to someone not already familiar with the defense theory of the case. The military judge also found that, although the

videos showed inappropriate behavior that was arguably abuse, a reasonable person could have interpreted the additional videos as children rough-housing. The military judge also found that the "shock knife" video alone was sufficient to demonstrate the severity of the mistreatment of YH and why appellant disciplined AL and JL.

Before the military judge, appellant argued that the additional videos constituted newly discovered exculpatory evidence, and the failure of CID to provide appellant the videos sooner constituted fraud on the court-martial. The military judge correctly applied R.C.M. 1210(f) and concluded that appellant's claims failed on essentially all prongs of both theories.

We concur with the military judge that the failure of CID to correctly intuit what Mr. CC was requesting when he asked for any "torture" videos was simply not fraud on the court-martial. At worst, it was a miscommunication. Further, CID explained to Mr. CC how to request a forensic copy of the digital media in question. Neither Mr. CC nor any other member of the defense team made such a request. The defense did not even bring the issue of the additional videos to the attention of the trial counsel.

Even if the failure to provide Mr. CC the videos were "fraud on the court-martial" within the meaning of R.C.M. 1210(f)(1) it had no appreciable effect on the outcome of trial. As the military judge correctly noted, "no fraud on the court-martial warrants a new trial unless it had a substantial contributing effect on a finding of guilty or on the sentence." R.C.M. 1210(f)(3). In this case, the military judge found the additional videos had "little probative value," and especially in light of the "shock knife" video, "would have added minimal support to the defense theory." We agree.

Appellant's argument that the additional videos warrant a new trial as newly discovered evidence also fails. Newly discovered evidence warrants a new trial only when it (1) "is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence;" and, (2) "if considered by a court-martial in light of all other pertinent evidence, [it] would probably produce a substantially more favorable result for [appellant.]" R.C.M. 1210(f)(2). Appellant's claim fails both requirements.

The military judge correctly concluded the exercise of due diligence would have led to the discovery of the additional videos. Indeed, despite the fact that appellant personally knew of the additional videos at all relevant times, his defense team did not make any specific request for them prior to trial. Even during trial, appellant's defense team did not request the videos from the trial counsel, but rather, sent their private investigator to CID offices without prior coordination. Even when CID agents explained to Mr. CC how to properly request access to a full forensic copy of appellant's computer, Mr. CC failed to do so, and instead personally asked

CID to look for "torture" videos. Appellant and his defense team simply did not exercise due diligence in seeking the additional videos. If they had, they would have found them. One of appellant's defense counsel recovered the videos in approximately thirty minutes when she personally met with CID and explained where to look for the videos.

The military judge was also correct when he concluded that presentation of the videos to the fact finder would not have produced a substantially more favorable result for appellant. As discussed above, the military judge found the additional videos "would have added minimal support to the defense theory."[11]

Appellant's claim that he would have testified in his own defense if his defense team had the additional videos is simply not credible. Appellant admitted that he personally knew about the additional videos at all relevant times. His defense counsel had full opportunity to cross-examine AL and JL about the existence of the videos but chose to limit cross-examination to the topic of the "shock knife" video.[12]

Appellant claimed that, without the videos, he did not think he would be believed when he testified about how angry he was at his children. Appellant's claim makes no sense. The court-martial was presented evidence of the worst conduct by AL, JL, and appellant's son toward YH. AL and JL testified that appellant struck them both in the face with his hand after he found the videos. The fact that appellant was extremely angry with his children after finding the videos was not meaningfully in dispute.

Appellant's motive for hitting and otherwise disciplining his children was immaterial to the defense theory. The defense theory was that AL and JL fabricated their reports of sexual abuse because of the discipline itself, not because of the

---

[11] Although this did not factor into the military judge's ruling, the only specifications to survive our review are those with significant corroborating evidence that long-predates any motive to fabricate arising in 2012. Thus, the probative value of the additional videos is diminished even further in appellate hindsight.

[12] There is no reason to believe AL or JL would have responded untruthfully if asked about the existence of other videos. Both AL and JL admitted to making the "shock knife" video, and committing the acts depicted therein.

reason they were disciplined.[13]  If appellant meant to claim that the additional videos would have shown his anger was more justified, that is beside the point.  Moreover, appellant never claimed that he would have testified on the substance of the charges against him if he testified.

The military judge did not abuse his discretion by denying appellant's motion for a new trial.  To the contrary, the military judge's findings of fact were well-grounded in the record, he applied the correct law, and his conclusions were wholly reasonable.

*C.* Hills *Error*

In *United States v. Hills*, the Court of Appeals for the Armed Forces (CAAF) held it is error to consider evidence of charged misconduct to show an accused has a propensity to commit other charged misconduct.  75 M.J. at 352.  Thus, "evidence of a charged and contested offense, of which an accused is presumed innocent, cannot be used as propensity evidence in support of a companion charged offense." *Hukill* 76 M.J. at 222.  Such use of an impermissible propensity inference is error with constitutional implications. *Id.*  The constitutional rights of an appellant are implicated by such error because it violates an appellant's "presumption of innocence and right to have all findings made clearly beyond a reasonable doubt." *Id.*  The government concedes the error in this case must be tested for prejudice under the harmless beyond a reasonable doubt standard. [14] *See generally id.* (citations omitted).

---

[13] We do not mean to suggest that appellant's "discipline" of AL and JL was appropriate.  JL testified that appellant struck her so hard her "face went numb."  We make no finding on whether the defense of parental discipline would actually apply to appellant's otherwise assaultive behavior in striking his daughters.

[14] The military judge limited his consideration of the only Mil. R. Evid. 413 evidence to which appellant objected to adult offenses of which appellant was later acquitted.  Appellant never objected to the consideration of Mil. R. Evid. 413 or 414 evidence as to the offenses of which appellant was later convicted.  In fact, the military judge did not say he was considering any charged misconduct as evidence of appellant's propensity to commit sexual offenses against children. Nevertheless, the government now concedes the military judge likely made such an inference in light of *Hukill*.  As appellant made no objection to the military judge's presumptive consideration of any other Mil. R. Evid. 413 or 414 evidence, the error at issue in this case is unpreserved.  As forfeited error, plain error analysis applies.  Under plain error analysis, an appellant must show: "(1) error, (2) that is clear or obvious at the time of appeal, and (3) prejudicial." *United States v. Williams*, 77 M.J. 459,

(continued . . .)

The government further concedes it cannot show the use of impermissible propensity evidence was harmless beyond a reasonable doubt for any specification of sexual misconduct of which appellant was convicted except the rape of AL. We accept the government's concession, and provide relief accordingly in our decretal paragraph.

The government argues the evidence supporting appellant's conviction for the rape of AL is so strong, however, we should find the *Hills* error was harmless beyond a reasonable doubt with respect to that specification. We agree. While harmlessness beyond a reasonable doubt is an exceedingly high bar, the quantum of evidence showing appellant raped AL surpasses it.

We draw guidance from the CAAF's recent opinion in *United States v. Williams*, 77 M.J. 459 (C.A.A.F. 2018). In *Williams*, the CAAF set aside all but one conviction of sexual offenses due to the same error at issue in this case. The CAAF affirmed one specification, however, because it was supported by independent evidence corroborating the circumstances surrounding the sexual offense, although there was no direct corroboration of the sexual act itself. *See id.* at 464. The corroborating evidence related to Williams' physical assault of his wife contemporaneous with his sexual offense against her. *Id.* In *Williams*, the corroborating evidence included the presence of non-sexual injuries inflicted in the contemporaneous assault, and the distraught demeanor of Williams' victim shortly after he assaulted her.

The evidence supporting appellant's conviction for raping AL is similar to the evidence supporting the specification in *Williams* discussed above. AL, TW, and NB all testified that appellant went to the liquor store where NB worked to purchase vodka on New Years' Eve. AL and TW both confirmed they drank large quantities of vodka with appellant that night and became highly intoxicated. NB verified that

---

(. . . continued)
462 (C.A.A.F. 2018). We note that there is divergent precedent from our superior court on what standard of review should apply to the prejudice prong of forfeited constitutional error. *Compare, e.g. United States v. Carter*, 61 M.J. 30, 35 (C.A.A.F. 2005) ("[i]n the context of a constitutional error, the burden is on the Government to establish that the [error was] harmless beyond a reasonable doubt") *with, e.g. United States v. Guardado*, 77 M.J. 90, 93 (C.A.A.F. 2017) (testing for "whether this instructional error materially prejudiced Appellant's substantial rights"), *and United States v. Humphries*, 71 M.J. 209, 215 (C.A.A.F. 2012) (testing for whether error materially prejudiced a *constitutional right* of the appellant). In this case, we apply the harmless beyond a reasonable doubt standard because the government has conceded on brief that it is the correct standard to apply.

the vodka bottles were empty the following morning and AL and TW were hung over and had vomited copiously. NB confirms there were bruises on AL's neck consistent with choking, and bruises on her legs. NB also testified that AL complained the next morning that she was "hurting all over," and specifically, "her butt hurt." NB and TW both testified that AL was highly agitated and crying the next morning. NB explained that AL did not want to talk about what had happened and did not want to be touched.

Although the government concedes the issue of *Hills* error, we note that it is not clear on the record that the military judge even considered propensity on the issue of appellant's guilt or innocence. The government explicitly invoked propensity in response to appellant's blanket R.C.M. 917 motion, but did not explicitly invoke propensity during closing arguments. On brief, appellant argues the government implicitly invoked propensity by arguing about appellant's "victim tree," arguing appellant "does what [he] does," and arguing appellant is "not a man who takes [']no['] for and answer." We disagree, at least in part.

The references to a "victim tree," and presentation of a wire diagram showing the relationships between various alleged victims and appellant are plainly attempts to grapple with the fact that appellant was charged with multiple crimes against multiple victims, and it can be hard to sort through them all. Acknowledging the reality of the charge sheet and asserting the strength of the government's evidence is different from making an impermissible propensity argument. The government's reference to appellant doing "what [he] does" was in reference to a specification for enticing prostitution, which is not an offense to which Mil. R. Evid. 413 or 414 apply. The statement that appellant is "not a man who takes [']no['] for an answer" might be taken as a reference to propensity under other circumstances.[15] Under the facts of this case, however, the statement was consistent with the government's theory of the case for several offenses where alleged victims protested appellant's sexual advances and he allegedly did not heed their protestations. For each of those charges, the government's theory was that appellant literally and figuratively did not take "no" for an answer. This was not, however, the government's theory of the case for the rape of AL.

On balance, the government's references to propensity during the closing arguments were minimal, and played almost no role in its presentation of evidence or argument on the merits. We consider this not for the question of whether *Hills* error occurred—the government has conceded it did and we have accepted that concession—but rather, in assessing what, if any, role the error played in appellant's

---

[15] Appellant's argument would be stronger had the government argued appellant was "not the *kind* of man who takes 'no' for an answer."

conviction for raping AL. We find the error played no meaningful role. The evidence supporting appellant's conviction is overwhelming, and the government made little to no effort to pile on to that evidence by invoking propensity during closing arguments.

Appellant was convicted of both providing AL alcohol and of choking AL. Appellant committed both crimes contemporaneously with appellant's rape of AL. The proof of these offenses, which facilitated appellant's rape of AL, was overwhelming. Under these circumstances, and considering the strong corroborating testimony of TW and NB, we find any error in considering impermissible propensity evidence was harmless beyond a reasonable doubt with respect to appellant's conviction of raping AL.

## CONCLUSION

The findings of guilty of Specifications 2 and 3 of Charge I; Specifications 4, 5, 6, 9, 10, and 11 of Charge II; and The Specification of Additional Charge II, are SET ASIDE. Specifications 5 and 6 of Charge II are DISMISSED. The remaining findings of guilty are AFFIRMED.

The sentence is SET ASIDE. The same or a different convening authority may: (1) order a rehearing on Specifications 2 and 3 of Charge I; Specifications 4, 9, 10, and 11 of Charge II; and The Specification of Additional Charge II. (2) dismiss Specifications 2 and 3 of Charge I; Specifications 4, 9, 10, and 11 of Charge II; and The Specification of Additional Charge II, and order a rehearing on the sentence only. (3) dismiss Specifications 2 and 3 of Charge I; Specifications 4, 9, 10, and 11 of Charge II; and The Specification of Additional Charge II and reassess the sentence, affirming no more than a dishonorable discharge, confinement for forty years, and reduction to E-1.[16]

---

[16] In reassessing the sentence we are satisfied that the sentence adjudged on only Specification 5 of Charge I, Specification 8 of Charge II, and The Specification of Charge IV, would have been at least a dishonorable discharge, confinement for forty years, and a reduction to the grade of E-1. *See United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986); *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013). The rape of AL was easily the most serious and most violent offense of which appellant was convicted and carried a maximum punishment of confinement for life without the possibility of parole. This reassessment, being both appropriate and purging the record as it stands of error, does not otherwise limit the sentence that may be adjudged at a rehearing. *See* UCMJ, art. 63.

LONG—ARMY 20150160

Judge FEBBO and Judge SCHASBERGER concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court